[Nos. 1888 AND 1917]

# B. A. GAMBLE AND F. S. CHADBOURNE, PLAIN-TIFFS-RESPONDENT, *v.* L. J. HANCHETT, DEFEND-ANT; LAURA C. WRIGHT, ERNEST WRIGHT, AND ANNIE BEATRICE WRIGHT, DEFENDANTS-RESPONDENT.

# DeWITT CLINTON BLAIR, IN HIS OWN RIGHT AND AS ADMINISTRATOR, WITH THE WILL ANNEXED, OF THE ESTATE OF JOHN I. BLAIR, DECEASED, SILVER PEAK MINES AND THE SILVER PEAK GOLD MINING COMPANY, DEFENDANTS-APPELLANT.

### ON PETITION FOR REHEARING

1. APPEAL AND ERROR—PETITION FOR REHEARING.
   The questions raised for the first time on a petition for a rehearing will not be considered.

2. IDEM—IDEM—JURISDICTION—JUDGMENT—ESTOPPEL.
   It is a general rule that a jurisdictional question may be raised at any time. However, a party, by his conduct, may become estopped to raise such a question. Where a party has treated a judgment as final throughout the proceedings, applied for and obtained relief upon the assumption that such judgment was final, and upon appeal prayed for its affirmance or reversal, he will not thereafter be heard to question its finality.

3. IDEM—IDEM—REPLY TO PETITION.
   An appellant who has prevailed on appeal and obtained a reversal of the judgment and order appealed from, as prayed for, will not be heard for the first time on reply to a petition for a rehearing, to suggest that a further order be made directing the lower court to dismiss the action.

4. JURISDICTION—COURTS—IMPLIED ADJUDICATION.
   It is a primal duty of all courts to keep strictly within their jurisdiction. In every affirmative action taken by a court, there is an implied adjudication of jurisdiction.

5. IDEM—IDEM.
   A court should always take note of a suggestion of want of jurisdiction, notwithstanding the rule as to waiver or estoppel, where rights of third parties may be involved and may raise the question of its own motion.

6. WRIT OF ASSISTANCE—WHEN MAY ISSUE.
   A writ of assistance only issues as part of the process to carry out a final judgment.

7. JUDGMENTS.
   Whether a judgment is final or is only interlocutory is a question of law.

8. MERITS OF CASE—FORMER OPINION REAFFIRMED.
     The decision on the merits heretofore rendered (34 Nev. 351) reaffirmed.

   TALBOT, J., dissenting from order denying petition for rehearing, and concurring in order reversing judgment.

PETITION for rehearing. [For former opinion, see 34 Nev. 351.] **Denied.**

The facts sufficiently appear in the opinion.

*J. W. Dorsey* (*R. M. F. Soto*, of Counsel), for Petitioners:

The judgment appealed from was not final, but merely interlocutory. Consequently it is nonappealable and for the same reason the trial court was without jurisdiction to hear or entertain a motion for a new trial, except to dismiss it, or, which is the same thing, to deny it as premature. Hence the appeal from the judgment, being merely interlocutory, should be dismissed, and the order denying a new trial should be affirmed, or the appeal therefrom also dismissed, because the motion was premature.

These objections affect the subject-matter in respect to jurisdiction, and are therefore open to inquiry or suggestion at any time, even on the court's own motion. (*Bullock* v. *Taylor*, 112 Cal. 147, 151; *Pac. Mut. Ins. Co.* v. *Fisher*, 106 Cal. 224, 229; *In re Castle Dome M. & S. Co.*, 79 Cal. 246; *State* v. *Logan*, 1 Nev. 509, 514.)

It is a well-settled principle that consent cannot confer jurisdiction over the subject-matter. (1 Black, Judgm. 2d ed. sec. 217.)

In a word the record must disclose whether jurisdiction exists, and a stipulation as to the correctness of the record cannot divest this court of the power to judge for itself, as a pure question of law, whether the judgment is a final judgment from which an appeal is allowed by law. (*Estate of Pichoir*, 139 Cal. 694; *San Francisco L. Co.* v. *Bibb*, 139 Cal. 325, 328; *Estate of Scott*, 124 Cal. 671; *McKeon* v. *Naughton*, 88 Cal. 462, 566; *Gibson* v. *Harmon*, 54 L. R. A. 268; *State* v. *Aloe*, 47 L. R. A. 394, 397; *Attorney-General* v. *Rice*, 64 Mich. 385, 391; *Duff* v. *Duff*, 71 Cal. 513; *Williams* v. *Conroy*, 52 Cal. 414; *Koford* v.

*Gordon,* 122 Cal. 314; *State* v. *Langan,* 29 Nev. 459; *Kapp* v. *Kapp,* 31 Nev. 70; *Kapp* v. *District Court,* 32 Nev. 264.)

The trial court was without power to hear or determine the motion for a new trial except to. dismiss or deny it. (*Descalso* v. *Duane,* 33 Pac. 928; *Perkins* v. *N. S. M. Co.,* 10 Nev. 405; *Rhodes* v. *Williams,* 12 Nev. 20; *Williams* v. *Conroy,* 52 Cal. 414; *Crowther* v. *Rowlandson,* 27 Cal. 376; *Harris* v. *S. F. S. R. Co.,* 41 Cal. 393; *Hastings* v. *Hastings,* 31 Cal. 95; Comp. Laws, 3290; *Painter* v. *Painter,* 113 Cal. 371; *Hinds* v. *Gage,* 56 Cal. 486; *Reclamation District* v. *Thisby,* 131 Cal. 572; *Bates* v. *Gage,* 49 Cal. 126.)

The law makes no distinction between an appeal in an action at law and one in an equity suit. (Comp. Laws, 3857; *Whitmore* v. *Shiverick,* 3 Nev. 288; *Burbank* v. *Rivers,* 20 Nev. 81.)

The court should determine of its motion the question of its jurisdiction of an appeal, though the point be not raised by the parties. (*Sennette* v. *Police Jury,* 56 South. 653; *Ferguson* v. *Mott,* 139 S. W. 218; *Cable* v. *Duke,* 208 Mo. 557, 106 S. W. 643.)

The evidence does not warrant the conclusion that the plaintiffs were guilty of laches. It is not shown that the delay has worked any injury to the appellants. Laches consists not in mere delay, but in delay which works an injury. (*Comans* v. *Tapley,* 57 South. 567; *Boone* v. *Templeton,* 158 Cal. 290.)

No evidence was introduced to show the value of the mining properties at any time. The respondents were not called upon to offer performance in the face of the hostile claim of Hanchett in which he was abetted by the attitude of Silver Peak Mines and John I. Blair in the litigation instituted by Blair.

*In Answer to Appellant's Reply:* The judgment of this court on appeal was one of a mere reversal, without qualification, of the judgment and order appealed from.

The effect of such reversal without restrictions was to remand the cause to the court below, there to be proceeded with as if it had never been tried. (3 Cyc. 460; *Myers* v. *McDonald,* 68 Cal. 162; *Stearns* v. *Aguirre,* 7 Cal. 443; 2

Black on Judgments, 2d ed. sec. 683; *Carpy* v. *Dowdell*, 131 Cal. 499.)

Counsel rely upon *Feusier* v. *Sneath*, but this court cannot say as a matter of law that upon a new trial the respondents and the defendants Wright may not be able to adduce evidence to entitle them again to the same judgment as is now before this court. (*Schroeder* v. *L. T. V. G.*, 60 Cal. 467; *Merrill* v. *First Nat. Bank*, 94 Cal. 59.)

It was the appellants who claimed that the judgment is final. In the same opinion, denying the writ of prohibition this court stated that the petitioners (appellants here) contended among other things: "(4) That the judgment appealed from is a final one, from which an appeal will lie."

The principal contention of the appellants in their application for a writ of prohibition was that the judgment should not be enforced by a writ of assistance, the execution of which had been stayed by the giving of a $150,000 bond.

*Samuel Platt* and *Geo. A. Bartlett* (*Rush Taggart* and *Clarence Blair Mitchell*, of Counsel), for Appellants:

The petition for a rehearing should be denied. The judgment appealed from is a final judgment. Respondents, having treated it as a final judgment, cannot be heard, especially for the first time on petition for a rehearing, to question its finality. (*Perkins* v. *S. N. S. M. Co.*, 10 Nev. 405; *Costello* v. *Scott*, 30 Nev. 43; *Bryant* v. *Davis*, 22 Mont. 534; *State* v. *Comm.*, 22 Nev. 71; *Crosby* v. *N. B. M. Co.*, 23 Nev. 74; *Brandon* v. *West*, 29 Nev. 140; *Powell* v. *N. C. O. Ry. Co*, 28 Nev. 305; *Beck* v. *Thompson*, 22 Nev. 419; *Kirman* v. *Johnson*, 30 Nev. 154.)

The case upon the merits is thoroughly covered by the opinion filed. The petition for a rehearing presents nothing new nor anything not thoroughly covered by the briefs heretofore filed and considered by the court.

The facts and law of this case, as shown by the record and opinion filed, justifies judgment being entered in

favor of appellants. Appellants ask that the judgment of this court heretofore entered be modified by directing that judgment be entered in favor of the defendants-appellants, dismissing the action with costs. (Rev. Laws, 4835, 4839; *Feusier* v. *Sneath*, 3 Nev. 120.)

By the Court, Norcross, J.:

Upon petition for a rehearing, counsel for respondents raise, for the first time, the question of the jurisdiction of this court to consider and determine the appeal. Want of jurisdiction is urged upon the ground that the judgment entered in the court below was not a final judgment, and therefore an appeal therefrom would not lie.

This court has repeatedly held that questions raised for the first time on petition for rehearing will not be considered. (*Kirman* v. *Johnson*, 30 Nev. 154; *Brandon* v. *West*, 29 Nev. 135; *Powell* v. *N. C. O. Ry.*, 28 Nev. 305, 343; *Beck* v. *Thompson*, 22 Nev. 419.)

While it is a general rule that a jurisdictional question may be raised at any time, it is also settled in this court that a party may, by his conduct, become estopped to raise such a question. A party in an appellate court who has treated the judgment as final and asked that the same be affirmed or reversed will not be heard afterwards, when the decision has gone against him, to contend that the judgment was not final and the court therefore without jurisdiction to determine the questions presented on the appeal.

In *Costello* v. *Scott*, 30 Nev. 88, a case where the finality of the judgment was questioned for the first time on petition for a rehearing, we said: "Even if there was room for argument as to whether the judgment rendered in this cause was a final judgment, appellants, by treating it as such and appealing therefrom, are estopped to deny the finality of the decree"—citing *State* v. *Commissioners*, 22 Nev. 78.

In *State* v. *Commissioners, supra,* this court said: "Lander County treated it as a final judgment when it appealed from it to this court, and we entertained the

appeal and decided the case upon its merits. Having treated the entry as a judgment decisive of the merits of the case, and having taken and received the benefit of a remedy which it was otherwise not entitled to, we think that Lander County, and consequently the defendants, as its representatives, should now be estopped to claim that no final judgment has been entered in the action. In Bigelow on Estoppel, p. 601, the author says: 'It may accordingly be laid down as a broad proposition that one who has taken a particular position in the course of a litigation must, while that position remains unretracted, act consistently with it.' * * * In *Clark* v. *Dunman,* 46 Cal. 204, the court said: 'The only point to be decided under the agreed statement is whether the decree of August 20, 1869, is a final money judgment in the sense of the statute, and therefore bore interest. The plaintiff in this action treated the decree as final when he prosecuted an appeal from it. If it was not final his appeal should have been dismissed on that ground. But we entertained the appeal and decided the cause, and in justice the plaintiff should now be estopped to deny the finality of the decree.' "

In *Brandon* v. *West, supra,* we said: "There was no motion made to dismiss the appeal from the judgment because of any alleged defect therein, nor was the sufficiency or regularity of the appeal questioned upon the presentation of the cause. The case was briefed, argued, and presented as though the appeal was entirely regular. Its sufficiency, therefore, cannot now be questioned upon petition for rehearing."

In *Taylor* v. *Crook,* 136 Ala. 354, 34 South. 905, 96 Am. St. Rep. 26, it was held that one who induces the dismissal of an appeal on the ground that the decree is not final cannot afterward claim as against a bill of review that it was final. See, also, *Ohio and Mississippi Railroad Co.* v. *Heaton,* 137 Ind. 14, 35 N. E. 687.

In *Silver Peak Mines* v. *District Court,* 33 Nev. 120, we said: "By the stipulation in the lower court regarding a bond to be given in compliance with that section,

petitioners become estopped to deny that the section governed the undertaking to stay execution in the case, or to assert, as they have done, that the other sections controlled the stay bond.    This is not the first time that we have had occasion to hold that the parties are estopped to rely in this court upon a position the reverse of that taken by them in the district court."

We see no valid reason why the rule of estoppel to question the finality of the judgment ought not to apply as well to a respondent who has assumed throughout the proceedings that the judgment was final.    In this case counsel for respondents, not only did not question the finality of the judgment in brief or oral argument, but prayed for its affirmance.    In the lower court they stipulated that the statement on motion for a new trial should be regarded as the statement on appeal from the judgment.    They also petitioned for and obtained an order for the issuance of a writ of assistance as a part of the process to carry out the judgment, assuming, as they must have done for such purpose, that the judgment was final.    (4 Cyc. 294; 3 Standard Procedure, 140; *Stanley* v. *Sullivan*, 71 Wis. 586, 37 N. W. 801, 5 Am. St. Rep. 245.) See "Argument for Respondents," *Silver Peak Mines* v. *District Court*, 33 Nev. 108.

In the briefs filed by counsel for respondents in the prohibition proceedings last above cited, which briefs were referred to and made a part of the briefs filed in this case, it was one of the contentions of counsel for respondents, as a reason why prohibition would not lie against the issuance of the writ of assistance, that the petitioners in that case had the right of appeal from the order granting the writ, under the provisions of Comp. Laws, 3425.    Under that section, the order, if appealable, was so because it was "a special order made after the final judgment."    In this court and the court below both parties have contended that the judgment was final, and both parties have sought for and obtained relief upon the theory that the judgment was final, and both courts have assumed its finality.

It is a primal duty of all courts to keep within their jurisdiction. Whenever a court takes any affirmative action there is an implied adjudication that it has jurisdiction so to act. (11 Cyc. 700; *Manier* v. *Trambo*, Fed. Cas. No. 18,309; *Cook* v. *Weigley*, 68 N. J. Eq. 480, 59 Atl. 1029.)

Whether the judgment is final or only interlocutory is a question of law. That question having impliedly been determined in favor of its finality, and both parties having proceeded in both courts upon the assumption that it was final, neither party will be heard to raise the question for the first time on petition for rehearing.

Undoubtedly, a court, at any time, even of its own motion, may determine a question of jurisdiction, and there are cases where, notwithstanding that the rule as to waiver would ordinarily apply, the court should not refuse to take notice of a suggestion of want of jurisdiction; for example, a case like that of *In re Castle Dome Mining Co.*, 79 Cal. 246, 21 Pac. 746, where a party interested in maintaining the judgment and who would be injuriously affected by its reversal is not made a party to the appeal by the service of notice of appeal upon him.

A court, however, should not be required, on petition for a rehearing, to go into the consideration of a legal question, which has virtually been adjudicated in accordance with the contentions of all the parties, for the sole purpose of affecting the jurisdiction in the event the direct ruling might be contrary to that implied.

The lower court determined all the issues raised by the pleadings in the case, and the judgment entered was manifestly intended as a final judgment, and it was so treated by all the parties.

In addition to the jurisdictional question, the petition for a rehearing is confined to an argument of the questions fully considered and determined in the opinion heretofore rendered. We entertain no doubt as to the correctness of the conclusion heretofore reached upon the merits of the case.

Included in the reply to the petition for a rehearing, counsel for appellants have requested this court to modify the order heretofore made by directing the court below to enter a judgment in favor of the defendants dismissing the action with costs. No contention was made, upon the hearing, that such an order should be made by this court. If counsel for appellants were of the opinion that this is such a case as would justify this court in directing a judgment in appellant's favor, they should have presented that question upon the original hearing when opposing counsel would have had full opportunity to be heard in opposition. A question as to the modification of the order heretofore entered, in the respect suggested, will not now be considered. (*Brandon* v. *West*, 29 Nev. 138.)

The petition for a rehearing is denied and the cause remanded.

SWEENEY, C. J.: I concur.

TALBOT, J., dissenting from the order denying petition for rehearing, and concurring in the order reversing the judgment:

The opinion of the majority of the court, stating the facts at length, the contentions of the parties, and the history of the case, with a copy of the contract in dispute, will be found in 34 Nev. 351. Since the rendition of the opinion the petition for rehearing and answer thereto have been filed, and the petition has been denied by the two members of this court who concurred in the opinion.

Consideration of the controlling facts is essential to a proper understanding of the case.

In the spring of 1893 the defendant Gamble went to New York and obtained from John I. Blair an option on all the stock of the Silver Peak Mines, with the privilege of investigating the property, making surveys, prospecting, taking ore from the mines, and working it at the mill; the proceeds to be paid to the Silver Peak Mines

unless he purchased the property, in which case the same would become a part of the purchase price of $500,000, $200,000 of which was required to be paid on or before the 1st day of November, 1893. Under date of August 5, 1893, he assigned a half interest in this contract to Chadbourne. A short time thereafter Gamble took out experts and had them examine and report upon the mines. In consideration of the receipt of $250 from Chadbourne and J. B. Wright, and transportation, Gamble agreed, on October 30, 1893, to go to New York to try to obtain a bond on the property of the Silver Peak Mines and to transfer to Chadbourne and Wright a one-third interest each in any bond he might acquire.

Under date of November 13, 1893, Gamble obtained from John I. Blair an agreement for an option on the property of the Silver Peak mines. The time for fulfilling certain conditions connected therewith was extended by John I. Blair to February 1, 1894. In January, 1894, C. J. Canda, who represented John I. Blair and the Silver Peak Mines and transacted the business for them and was secretary of the company, had received a letter from Chadbourne stating that they had concluded to send L. J. Hanchett to New York. As a result of the latter's visit to that city and of his negotiations with Canda, John I. Blair by letter dated February 2, 1894, extended the time for the execution of the contract or option until the 1st day of May, 1894. On April 24, J. B. Wright wrote to Canda asking an extension of ninety days from May 1, 1894. On May 4, 1894, Canda wrote to Wright saying that they would give him all reasonable extensions necessary, but objected to recommending Mr. Blair to give as much as ninety days' additional time. In the letter Canda stated that he was informed Mr. Chadbourne was one of Mr. Wright's most influential associates.

On June 4, 1894, Wright wrote to Canda, expressing gratification for the extension by telegram to July 1. On June 19, 1894, Canda wrote to Wright that as the result of a full conference with Hanchett he was sending a proposed contract executed by the Silver Peak Mines, to

execute both copies if satisfactory, and to send one back to Canda, or both if they did not meet with his approval. Canda also stated in this letter that the contract was slightly changed from the copy which Hanchett had taken with him.

On July 27, 1894, Canda wrote to Wright, inclosing contract as they in New York had modified it, asking Wright to return to Canda the two executed copies of the contract sent to Wright on June 19, and saying that they would defend the title to the mines until Wright was satisfied to pay for them. The contract enclosed with Canda's letter of July 27, 1894, was in the same form as the one given by the Silver Peak Mines in the name of Hanchett, of date September 7, 1894, which is in controversy, excepting that the date for the party of the second part to be put in possession and commence development work was August 1, 1894, in the contract sent to Wright, and October 1, 1894, in the one sent to Hanchett, and the dates allowing election to purchase August 1, 1895, and December 31, 1895, respectively, and the periods for the payment were accordingly.

On July 27, 1894, Canda transmitted a letter of John I. Blair to Wright, agreeing that if he exercised the option Blair would deliver on the completion of the purchase all the shares of the capital stock of the Silver Peak Mines. It will be observed that the time for exercising the option under this letter and under the agreement to Wright, which belonged to him and his associates, had a long time to run after the date of the contract in the name of Hanchett.

The evidence is clear and undisputed that Gamble secured the option originally and conveyed an interest to Chadbourne; that later Gamble, Chadbourne, and Wright had Gamble go to New York to obtain an option or extension in which they would each hold a one-third interest; that later Chadbourne and Wright sent Hanchett to New York as their representative to obtain a further extension or option, which was given to May 1. While these fiduciary relations existed with Gamble,

Chadbourne, and Wright, and within the period of ninety
days which Wright had asked of Canda as an extension
of their option from that date, Wright, with the assist-
ance of Hanchett, obtained the agreement of July 27
in his own name, but had that agreement returned to
Canda, and nearly eleven months before the time for
its fulfillment had expired Wright, Hanchett and Canda
had another contract, in similar form but with different
dates for payment and performance, executed by the
Silver Peak Mines in Hanchett's name, under date of
September 7, 1894, which is the one in controversy.

Upon the delivery of this contract a direct agreement
was executed between Wright and Hanchett, which pro-
vided that Wright should have, clear of expense, a twenty
per cent interest in the contract in the name of Hanchett.
On September 5, 1894, Wright stated in a telegram to
Canda: "On account of the pressure of company business
caused by the late strike I find I will not be able to per-
sonally attend to Silver Peak business and will place it
entirely in the hands of Mr. L. J. Hanchett to personally
supervise and manage. On that account would like much
to have the bond made in his name instead of mine." On
September 8, 1894, Hanchett wrote to Canda: "There are
too many people in the bond, on our side, who want to
share but who will not put up any money. For that reason
Mr. Wright telegraphed you to change the bond to my
name, as that will reduce the number interested so that
agreements can be reached and work commenced. I am
to look after the interests of Mr. Wright and the ones
directly interested, that is, ones who have put up the
money or have an active part in raising it. All of the
above so that you will understand why I am delaying
and why I want the bond transferred to me."

The contract in controversy, dated September 7, 1894,
in Hanchett's name, was forwarded with Canda's letter
to Wright dated September 19, 1894. On the same day
Canda wrote requesting the return of the other agree-
ment, which had been signed by the company, making it

clear that Wright, notwithstanding he was a party to the
venture and a part owner in the option, which had origi-
nally been secured by Gamble and later as an extension
in the name of Wright for the parties to the venture, was
mainly instrumental in securing the new contract in the
name of Hanchett, and was assisted in so securing the
same by Hanchett, Canda, and the Silver Peak Mines
without the consent of Gamble or Chadbourne. These
facts, as shown by letters, telegrams, contracts, and depo-
sitions, beyond dispute indicate that Wright, Hanchett,
Canda, and the Silver Peak Mines, while well knowing
that Gamble and Chadbourne had an interest in the
option, given for the Silver Peak Mines, surrendered the
contract in the name of Wright while they knew it was
owned by him in common with Gamble and Chadbourne,
and had a new agreement executed in the name of Han-
chett for the purpose of depriving Gamble and Chadbourne
of their two-third interest in the agreement or option
and eliminating them from the venture. This was done
with the intention and side agreement on the part of
Wright and Hanchett that Wright should have twenty
per cent clear of expense and Hanchett the remainder of
any money which might be made out of the option, and
with the willingness of Canda and the Silver Peak Mines
to transfer the rights of Gamble and Chadbourne to
Wright and Hanchett, at their suggestion, when they had
millionaire kindred and associates who, it was hoped,
might be induced to pay the Silver Peak Mines a half
million for the property.

It is shown not only by the deposition of Gamble that
Canda, who acted as agent for the company in all
the negotiations, was informed regarding the associated
interests of Gamble, Chadbourne, and Wright, but notice
of this was also given to Canda. In the letter of Decem-
ber 12, 1894, to Canda, Gamble stated: "Of course, I can
hold Mr. Wright and Hanchett by law to give me the
interest agreed upon.  *  *  *  The entire facts are as fol-
lows:  Mr. Wright and Chadbourne made an agreement

with me to carry my one-third interest of the amount
we would hold and they were to furnish the money
for all expenses.   *   *   *   Mr. Wright claimed that
Mr. Hanchett had some business of his own in New
York and would attend to this for me.   I was not to pay
any of the expenses under my contract, but for fear
something might happen I paid one-third of the expense.
When Hanchett returned he claimed an interest in the
contract.   *   *   *   Then Mr. Wright assigned the con-
tract to Mr. Hanchett.  Why I do not know.  I then asked
Mr. Wright to give me a contract for my one-third and
he told me to go to Hanchett." In January, 1895, Gamble
wrote to Canda: "These men were my partners, and I
don't see how they can make a contract on the side with-
out telling me and then declare me out.   My lawyers say
that I can hold Wright and Hanchett to the original
agreement, but I don't want a lawsuit if it can be
avoided, and this can be avoided by telling them to do
as they agreed to do by and with me.  If you will do
that Mr. Hanchett will lose no time in signing over my
interest."

On November 21, 1895, the Silver Peak Mines extended
to August 12, 1896, the option which had been given in the
name of Hanchett on September 7, 1894.   This extension
inured to the benefit of Gamble and Chadbourne because
they were part owners in the contract for the reason
stated before.   Canda, the representative of the Silver
Peak Mines, had declined to recognize any further rights
in Gamble; and as Gamble could not obtain recognition
of his rights in this agreement, which in effect withheld
from him any opportunity of going into possession of the
mines or purchasing them if he obtained the required
money or found parties willing to take them over, he
filed his complaint in this action on March 2, 1896, and
on March 6, 1896, a *lis pendens,* asking to be decreed the
owner of a one-third interest in the contract, over five
months before the termination of the extension obtained
by Hanchett.

The Silver Peak Mines brought suit against Hanchett in the United States Circuit Court for the Southern District of New York on April 6, 1897, and in the United States Circuit Court in Nevada on April 17, 1897, asking for a finding that the Hanchett contract was terminated, for the payment of royalties, and for damages for improper mining, which actions resulted in judgment being rendered against Hanchett.

John I. Blair brought a suit against the Silver Peak Mines and Hanchett in the federal court of Nevada in July, 1897, to foreclose the mortgage given by the Silver Peak Mines to him in 1879 for $204,000, bearing six per cent interest, obtained judgment, and had the property sold. In 1898, Blair recovered judgment in the United States Circuit Court for the Southern District of New York against the Silver Peak Mines for $68,000 for money which he had advanced to enable it to maintain and develop its properties. He brought suit upon that judgment and obtained judgment in the United States Circuit Court for the District of Nevada, and had the property sold. Gamble, Chadbourne, and Wright were not made parties in any of the suits brought by the Silver Peak Mines or by Blair, and it will be observed that all of these actions were brought after the filing of the complaint and the *lis pendens* in the present case brought by Gamble.

If notice to a corporation is required to be given to one agent or officer more than another, it would ordinarily be given to the secretary. Canda, as the agent and secretary of the Silver Peak Mines, and as the business representative of John I. Blair, conducted the negotiations and secured the execution of the contracts. Blair, living in New Jersey, at the advanced age of about ninety years, was not to be seen by the parties securing the options, and the negotiations, when conducted personally or by letter, were with Canda in New York. Notice to Canda as the representative of Blair and the company, and as secretary of the company, was notice to Blair and

to the company; consequently they all had notice that Gamble and Chadbourne and Wright were interested in the option and extensions. Canda, and through him the Silver Peak Mines and John I. Blair, certainly had notice of their own acts and that they had given the original option to Gamble with the understanding that he would induce men of capital to join in the enterprise; that he made trips to the property and at considerable expense had taken experts to examine and report upon it; that he had conveyed interests in the option to Chadbourne and Wright; that Chadbourne and Wright had assisted in securing an extension; that Chadbourne and Wright had sent Hanchett to interview Canda in New York and secure an extension or a new agreement giving an extension or further time, the agreement for which was given in the name of Wright; and that before the contract given to Wright for the benefit of Gamble, Chadbourne, and Wright had expired, Wright, by conspiring with Hanchett and Canda, obtained from the Silver Peak Mines a new option or extension in the name of Hanchett and surrendered the one given to Wright for the benefit of himself, Gamble and Chadbourne.

In addition to knowing all the facts which indicated the ownership of Gamble, Chadbourne, and Wright in the option, notice was given to Canda and the Silver Peak Mines of such ownership, although not necessary. Soon after the contract was executed in the name of Hanchett, and perhaps as soon as Gamble became aware of it, he wrote to Canda asserting his rights, stating that they were trying to deprive him of his interest and control by having the agreement taken without his name, and pleading to be protected. Consequently it appears that before the commencement of this suit by Gamble, and long before the institution of the suit by the Siver Peak Mines against Hanchett, Canda and the Silver Peak Mines were informed regarding the claims of Gamble, and before the contracts in the name of Hanchett were given, and regarding the facts which in law gave Gamble, Chadbourne and Wright an interest in the contracts, including

the last extension or agreement executed in the name of Hanchett.

The original promotion and expenditures were paid by Gamble, by reason of whose efforts Chadbourne, Wright, and Hanchett became interested. There was no pretense by Gamble that he had the money for developing the mines and building reduction plants or purchasing the property, but he made it plain from the beginning that he was seeking an option for the purpose of inducing men with capital to join him. Blair had long held the stock or mines, which had become hundreds of thousands of dollars in debt, and was anxious to sell or deal with some one who would make disposition of them.

Gamble was good enough to use as a promoter to interest men who might be induced to develop and purchase the property at a big price. It is shown by their respective correspondence that Gamble was given the option with the express understanding between him and Canda and Blair and the Silver Peak Mines that he would try to interest men with means. It was not expected that he would pay his own money for the mines. They were all aware that he was without means to buy the property. Under the well-settled rules of equity and just legal principles, after Chadbourne, Wright, and Hanchett had been induced to join and take an interest with Gamble in the option, Hanchett and Wright and the Silver Peak Mines could not by a surrender of the option without the consent of Gamble and Chadbourne shift it to the name of Hanchett so as to deprive them of their interest or defraud them of their right to share in the venture. Under these circumstances, Gamble ought not to be deprived of his interest because not possessed personally of means to buy the property, nor should any different rule of law be applied against him because he is poor, nor is the long and persistent opposition of his wealthy opponent any good reason for depriving him of his rights. He is as much entitled to comply with the terms of the agreement if he obtains any money required from others as if he

possessed any amount needed for fulfilling the agreement and taking over the property.

Canda wrote in his letter to Hanchett of September 19, 1894: "I send this to Mr. Wright with a letter to Mr. Wasson, asking him to return to me, before he delivers these to you, the original papers which have been signed by the company, and which he holds. It does not seem right that contracts executed by the company should be in two hands at the same time." And notwithstanding the contract in the name of Wright had not expired at the time Canda forwarded the one in the name of Hanchett, in the letter of January 8, 1895, Canda wrote to Gamble: "Mr. Wright also permitted his contract to expire, and after some weeks we entered into an agreement with Mr. Hanchett. The contract stands with him." Mr. Canda, who represented the corporation, and whose knowledge was notice to the Silver Peak Mines, had the Silver Peak Mines give an option to Gamble with the expectation that he would induce men with capital to develop or buy the mines; and after Gamble had induced Chadbourne and Wright to take an interest with him in the option, and after Wright and Chadbourne had authorized Hanchett to try to obtain in New York an extension or further option on the property, one-third of the expense of Hanchett's trip there being paid by Gamble, the Silver Peak Mines, acting through Canda, and while fully cognizant that Gamble had secured the option originally and that Chadbourne had acquired an interest in it, gave to Wright in his name the extension for which Gamble, Chadbourne, and Wright as parties to the venture and Hanchett had been working; and before this contract in Wright's name had expired it was surrendered by him, and at the instigation of Wright and Hanchett a new contract or extension was given by the Silver Peak Mines in the name of Hanchett.

By Wright first taking a contract in his own name while he was a party to the venture with Gamble and Chadbourne, and surrendering that contract and having another one taken in the name of Hanchett, and the side

agreement made between Wright and his father-in-law Hanchett, providing that Hanchett should hold four-fifths of the agreement for his own use and one-fifth as trustee for Wright, and that Hanchett at his own expense was to perform the acts required of Wright, it is evident that Wright and Hanchett, Canda, and the Silver Peak Mines were quite willing to eliminate Gamble and Chadbourne and their interest from the contract or option to meet the desires of Wright and Hanchett to secure for themselves the money to be made out of the option, without having to give Gamble and Chadbourne their proportions. Such practices should not in a court of equity deprive Gamble or Chadbourne of their rights in the venture. The moral sense of some men is so blunted that they believe they may deprive others of their rights by acquiring a contract, deed, or evidence of title or ownership in a different name, and it is the duty of a court of equity by its decision to correct such erroneous conclusions and give relief against the perpetrators of such fraudulent acts.

Canda and the Silver Peak Mines, in their eagerness to dispose of the property upon which such a large amount had been expended, complied without hesitation with the requests of the men associated with wealthy interests. Gamble having taken the original option, and having induced the men who might obtain the necessary means to join in the venture, had served a purpose, and, being considered no longer necessary to carry out the project, there was an attempt to cast him and Chadbourne aside in order that Wright and Hanchett might secure the benefits to which Gamble and Chadbourne, the pioneers in the project, might be entitled, notwithstanding the agreement of Wright and Chadbourne to carry Gamble's one-third interest and to furnish the money for expenses.

Whether these methods of high finance on the part of business men in New York and California be considered as "without the slightest warrant for a charge of fraud or double-dealing," and whether Wright and Canda and Hanchett and the Silver Peak Mines believed that by such

practices they could eliminate Gamble and Chadbourne and any interest which they held or profits to which they might be entitled in the venture, equity and just legal principles will not sanction such methods.

As Hanchett was aware that Gamble was the original party and had taken Chadbourne and Wright in as parties to the venture, Wright and Hanchett could not justly deprive Gamble and Chadbourne without their consent of their interest by taking extensions or new contracts in the name of Wright or in the name of Hanchett. Although Canda and the Silver Peak mines had full knowledge of these fiduciary relations, which under the law would prevent the rights of Gamble and Chadbourne from being cut off by shifting the contracts or taking them in the name of Wright or Hanchett, the rights of Gamble and Chadbourne would remain and be protected the same if Canda and the Silver Peak Mines had not been aware until given notice by or before suit that Gamble and Chadbourne held any interest in the venture.

As was said by the Supreme Court of the United States in *Root* v. *Railway Co.*, 105 U. S. 215, 26 L. Ed. 975: "Where a defendant has wrongfully intermeddled with property already impressed with a trust, he may be required as a trustee to account for it, as was done in the case of *People* v. *Houghtaling*, 7 Cal. 348, because trust property may be followed, wherever it can be traced, into whosesoever possession it comes, except that of a bona fide purchaser without notice."

There is no pretense that after Gamble had acquired the original option, taken experts to examine and report upon the mines, made trips to New York to secure contracts and extensions, and endeavored to find men to finance the promotion, and had arranged for Chadbourne to take a one-half interest with him, and later for Wright to take a one-third interest with him and Chadbourne, Gamble ever sold or parted with his remaining one-third interest, nor that Chadbourne ever parted with his one-third interest, unless they lost them through the legerdemain of Wright, Hanchett and Canda in shifting to the

name of Hanchett the option, not yet expired, in which Gamble and Chadbourne were part owners, or by taking a new agreement in the name of Hanchett.

When one in a fiduciary capacity seeks to have the right and property held jointly by him and others forfeited, he may generally believe that it belongs to him alone if he obtains the title in his own name. But the rights of the parties cannot be properly determined by the belief of Hanchett or Canda or the self-serving statements of Hanchett or any one else. The law is well settled that partners, persons interested in a joint adventure or as agents, must act in good faith for the protection of the rights of their associates, and equity will not permit one by trick or by obtaining an agreement or title in his own name to deprive others of their interest. It is legitimate for one of the parties to take a contract of conveyance in his own name for the benefit of the others, and with the intention of holding it for the rights of his associates; but when, as is evident in this case, an option is shifted to the name of one of the parties, or by one of the owners to another person who knows that it has been secured by or belongs to the real owners, for the purpose of depriving the others of their interests, it is more than constructive fraud, and is actual and intentional fraud, although the parties perpetrating it believe they can hold the entire right and that the others will no longer have any interest.

Canda, after having been put in position to negotiate with Wright and Hanchett through the efforts and expenditures of Gamble, and knowing that Gamble, Chadbourne, and Wright had become owners in the option, may have believed that by giving a new contract in the name of Wright, or by canceling or taking up the contract which had been given to Wright while he was a party in the venture with Gamble and Chadbourne, and executing a new contract in the name of Hanchett, any rights which Gamble or Chadbourne had in the option would be eliminated; but in the light of many decisions such is not the law, and his belief

could not affect the rights of the parties. Under the usual presumption that an existing condition is presumed to continue until the contrary is shown, the interests acquired by Gamble, Chadbourne, and Wright would remain in them until something arose to indicate the contrary. As soon as Wright took an interest with Gamble and Chadbourne and became a party to the venture, and when Hanchett acted for Wright and Chadbourne, and at the expense of Chadbourne, Gamble, and Wright in securing an extension and new agreement, Wright and Hanchett became bound to act in good faith for the protection of Gamble and Chadbourne, and any agreement acquired by them, whether in their individual names or otherwise, giving an extension of the option, was for the benefit of the other parties in interest, or for Gamble and Chadbourne to the extent of their proportions.

The law gives these rights, and they do not depend upon any such considerations as some slight discrepancy in the incompetent and improperly admitted evidence regarding statements of Hanchett and Canda, in the nature of conclusions and self-serving, as to whether Gamble and Chadbourne had any interest in the contract executed in the name of Hanchett. The contract which Hanchett secured in his own name by collusion with Wright, before the expiration of the contract given in the name of Wright, was held by him in trust for them or in fraud of their rights. The rights of Gamble and Chadbourne ought not to be lost or controlled by any assertions or beliefs of Hanchett or Canda. And although Canda, Blair, and the Silver Peak Mines had notice of these fiduciary relations and of all the necessary facts, which showed that in law Gamble and Chadbourne held and continued to hold their interests, it is immaterial whether that corporation had such notice, for no more could be required of it than compliance with its agreement, which would be the same whether Hanchett alone or others were the real owners of the option.

In *Botsford* v. *Van Riper*, 33 Nev. 191, in the opinion by Justice Sweeney, concurred in by Chief Justice Norcross

and a full court, it is said: "The law is well established that property purchased or acquired in connection with a joint adventure or profits realized from a joint adventure of the joint property of the parties interested, where one party holds title to the same, that such property is held in law to be the property of his associates, and the party holding the same is holding their proportionate share as trustee for them. (23 Cyc. pp. 453–459; *Hayden* v. *Eagleson,* 15 N. Y. St. Rep. 200; *Fueschsel* v. *Bellesheim,* 14 N.Y. St. Rep. 610; *Richardson* v. *McLean,* 80 Fed. 854, 26 C. C. A. 190; *Morris* v. *Wood,* 35 S. W. 1013; *Lyles* v. *Styles,* 15 Fed. Cas. 1143, No. 8,625; *Cunningham* v. *Davis,* 47 S. W. 140; *Matthews* v. *Kerfoot,* 64 Ill. App. 571; *Jones* v. *Davis,* 48 N. J. Eq. 493, 21 Atl. 1035; *Spier* v. *Hyde,* 92 App. Div. 467, 87 N. Y. Supp. 285; *Calkins* v. *Worth,* 215 Ill. 78, 74 N. E. 81; *Putnam* v. *Burrill,* 62 Me. 44; *McCutcheon* v. *Smith,* 173 Pa. 101, 33 Atl. 881; *Getty* v. *Devlin,* 54 N. Y. 403; *Church* v. *Odell,* 100 Minn. 98, 110 N. W. 346; *Knapp* v. *Hanley,* 108 Mo. App. 353, 83 S.W. 1005; *Hancock* v. *Tharpe,* 129 Ga. 812, 60 S. E. 168; *Reilly* v. *Freeman,* 1 App. Div. 560, 37 N. Y. Supp. 570; *Marston* v. *Gould,* 69 N. Y. 220; *Humburg* v. *Lotz,* 4 Cal. App. 438, 88 Pac. 510; *Williams* v. *Love,* 2 Head, 80, 73 Am. Dec. 191; *King* v. *Wise,* 43 Cal. 628.)

"We further find that the law is well established that the relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee, to whom the deal or property may be intrusted, and that such trustee will be held strictly to account to his coadventurers, and that he will not be permitted by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater rights in the property by reason of the fact that he is in possession of the property or profits as trustee than his coadventurers are entitled to. The mere fact that he is intrusted with the rights of his coadventurers imposes upon him the sacred duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers, and, if

he is recreant to his trust any rights they may be denied
are recoverable.    (23 Cyc. 455; *Cole* v. *Bacon*, 63 Cal.
571; *Hambleton* v. *Rhind*, 84 Md. 456, 36 Atl. 597, 40
L. R. A. 216; *Seehorn* v. *Hall*, 130 Mo. 257, 32 S. W. 643,
51 Am. St. Rep. 562; *Scudder* v. *Budd*, 52 N. J. Eq. 320,
26 Atl. 904; *Getty* v. *Devlin*, 54 N. Y. 403; *Hollister* v.
*Simonson*, 18 App. Div. 73, 45 N. Y. Supp. 426; *Reilly* v.
*Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Delmonico*
v. *Roudebush*, 5 Fed. 165; *Morris* v. *Wood*, 35 S. W. 1013;
*Knapp* v. *Hanley*, 108 Mo. App. 353, 83 S. W. 1005;
*O'Hara* v. *Harman*, 14 App. Div. 167, 43 N. Y. Supp, 556;
*Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *King* v. *Wise*,
43 Cal. 628.)

"Counsel for appellant seem to lay stress on the fact
that by reason of the appellant putting up most of the
costs in putting through this deal, and the fact that the
respondents were financially embarrassed, that this is
a further proof indicative of the weakness of or lack of
the consideration of the agreement sought to be enforced.
As before stated, the mere mutual promise of the parties
furthering and rendering their aid, advices, and sugges-
tions, if agreed to, was sufficient consideration to support
the contract under joint adventure; but the law is well
established that the furnishing of capital by the parties
to a joint adventure is not necessary to the validity of
the contract, so long as the original agreement on which
the contract was entered into was carried out.    (*Boqua*
v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Van Tine* v.
*Hilands*, 131 Fed. 124.)    The evidence discloses, and the
findings of the lower court are to the effect, that the
respondents performed their part of the contract entered
into, and stood ready at all times to further aid, as far as
lay in their power, pursuant to their agreement, the con-
summation of the deal originally agreed upon.    That they
were not called upon to do so by appellant is not sufficient
reason in law or equity to invalidate their right to share
in the profits of the deal, because the appellant saw fit to
take the reins and do most or all of the work himself
after the original agreement was made and entered into.

The fact that it required large sums of money to carry the deal through, counsel for appellant seem to believe, vitiates the consideration of the agreement alleged, for the reason it is admitted respondents were practically penniless. We fail to see any merit in this contention."

The opinion of Justice Norcross in *Costello* v. *Scott*, 30 Nev. 43, is also worthy of consideration.

In the case of *Hunt* v. *Patchin*, 35 Fed. 816, there were three owners as tenants in common of mining claims in Lincoln County, and by failure to do the annual work there was a forfeiture. The relocation by one of the owners was adjudged to be in trust for the others. In the course of the opinion, Judge Sawyer said: "I am entirely satisfied that these claims were relocated under the new names at the time for the benefit of all the original owners, or else they were located in bad faith by the defendant, after giving his associates, by his conduct, the right to believe, and when they did believe, that the location was for the benefit of all. Under this state of facts, I am clearly of the opinion that a trust arises in favor of complainant under the operation of law."

In *Lakin* v. *Mining Co.*, 11 Sawy. 238, 25 Fed. 337, a case similar, but not exactly like this, it was held that: "Where one party wrongfully obtains the legal title to land, which in equity and good conscience belongs to another, whether he acts in good faith or otherwise, he will be charged in equity as a constructive trustee of the equitable owner. Can it be doubted, on the facts as they appear in the pleadings and evidence, that defendant got whatever title he has to the interest of complainant and Jones in the mines in question through a breach of faith and confidence? It seems to me not. He must therefore be charged as trustee of their interests."

In the case of *Royston* v. *Miller*, 76 Fed. 50, involving the Kingston mines near Austin, Judge Hawley held that a coowner who undertakes to do the work necessary to hold mining claims cannot acquire any interest in them against his coowners because of the failure to do such work.

As said regarding joint adventures in 23 Cyc. 454, 455: "If no date is fixed by the contract for the termination of the adventure, or its termination is dependent upon the happening of a contingency, the agreement remains in force until the purpose is accomplished, or the happening of the contingency, and neither party can end it at will by notice or otherwise.   *   *   *   Where property is purchased as a joint venture, it is not material in whose name the title is taken, as any one holding the title will be regarded as trustee for his associates.   *   *   *   Persons united for a common purpose must be loyal to that purpose and each other.   None may, without the consent of all the associates, appropriate to his own use the common property, or by any dealing therewith secure an unfair advantage over those interested with him.   An advantage or profit secured by one inures to the benefit of all. *   *   *   Those aiding him in procuring an advantage may, in equity, be held equally liable with him for the fraud."   See, also, the note in 17 Ann. Cas. at page 1022.

In *Trice* v. *Comstock*, before the Circuit Court of Appeals, 121 Fed. 622, 57 C. C. A. 648, 61 L. R. A. 176, it is said in the opinion: "For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that inspire the actions of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation.   If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation, at the option of the latter, while it denies to the former all commission or compensation for his services.   *   *   *   And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence.   The relation of trustee and *cestui que trust*, principal and agent, client and attorney,

employer and employee, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation.

"From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his *cestui que trust*, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created. (2 Sugden on Vendors, 8th Am. ed. 406–409; Mecham on Agency, pp. 455, 456; *Tisdale* v. *Tisdale*, 2 Sneed, 596, 608, 64 Am. Dec. 775; *Ringo* v. *Binns*, 10 Pet. 269, 280, 9 L. Ed. 420; *McKinley* v. *Williams*, 74 Fed. 94, 95, 20 C. C. A. 312, 313; *Lamb* v. *Evans*, 1 Chan. Div. 218, 226, 236; *Connecticut Mutual Life Insurance Co.* v. *Smith*, 117 Mo. 261, 295, 22 S. W. 623, 38 Am. St. Rep. 656; *Van Epps* v. *Van Epps*, 9 Paige, 237, 241; 1 Levin on Trusts, 246, 180; *Davis* v. *Hamlin*, 108 Ill. 39, 49, 48 Am. Rep. 541; *Winn* v. *Dillon*, 27 Miss. 494, 497; *People* v. *Township Board*, 11 Mich. 222, 225; *Grumley* v. *Webb*, 44 Mo. 444, 454, 10 Am. Dec. 304; *Lockhart* v. *Rollins*, 2 Idaho, 540, 21 Pac. 413; *Eoff* v. *Irvine*, 108 Mo. 378, 383, 18 S. W. 907, 32 Am. St. Rep. 609; *Robb* v. *Green*, 2 Q. B. 315, 317; *Louis* v. *Smellie*, 73 Law Times, 224, 228; *Gardner* v. *Ogden*, 22 N. Y. 327, 343, 350, 78 Am. Dec. 192.)"

If Wright had not become associated with Gamble and Chadbourne as a party to the venture and part owner in the option which Gamble had secured, and if Hanchett had not undertaken to act in confidential relation for the parties in securing the new contract or extension given to Wright, he would have been at liberty to have taken in his own name and for his exclusive benefit a new contract from the Silver Peak Mines if the option secured by Gamble and the agreement sent to Wright had expired,

and a judgment against him under such a contract would have terminated all rights under it if the court had jurisdiction. But as Wright, under his agreement with Gamble and Chadbourne, had become a party to the venture with them and a part owner of the option secured by Gamble, and as Hanchett had undertaken to act for the others in securing the extension and new contract in the name of Wright, the one which he and Hanchett later secured in the name of Hanchett by having the one in the name of Wright surrendered before it had expired inured to the benefit of Gamble and Chadbourne to the extent of the proportions to which they were formerly entitled under their agreement with Wright, regardless of whether there was any intention by Wright or by Hanchett or Canda to defraud Gamble and Chadbourne of their rights, although such intention is shown, and regardless of whether by these practices Wright and Canda believed that they had cut off the rights of Gamble and Chadbourne by eliminating their names in the new agreement, and regardless of anything that Hanchett or Canda said or believed regarding Gamble having no further interest.

Even more unwarranted than basing the decision of this court on a judgment of the federal court, which appears to have been without jurisdiction, is the claim that Gamble had no interest in the contract executed in the name of Hanchett because Hanchett and Canda testified that Hanchett told Canda that Gamble had no interest in the contract. Such evidence was not even properly admitted, and should not have been given any weight. It was not for Hanchett when, through selfish motives, seeking to deprive Gamble of his rights in options obtained from the Silver Peak Mines, to make the law for this court by declarations in his own favor. Back of these assertions the facts prevail over mere declarations of self-interest.

Although there may be a variance in the bare statement as a conclusion of Hanchett that Gamble had no interest

and of Gamble that he had an interest, there is no dispute in regard to the controlling facts, which show that Gamble had, and that Hanchett, Canda, and all the parties interested knew that Gamble had, secured the option originally, and that by reason of his obtaining it and through his efforts and expenditures Chadbourne and Wright and Canda had become interested in the option, either as partners or as parties to a joint venture, to which the ordinary rules of partnership would apply, and under which each would be bound to act in good faith for the protection of the rights of the others. Under these conditions, any assertion of Canda that Gamble had no interest, whether made with the belief that he had none because Hanchett had so asserted, and any statement or acts of Hanchett or Canda in surrendering the option and executing the agreement for a new one in the name of Hanchett, whether done by either or both of them for the purpose of eliminating Gamble, could not deprive him of his right as a partner or party to the joint venture. Gamble was asserting and writing to Canda that Gamble had an interest in the final contract, and was pleading with Canda to protect him in that interest. There would be quite as much, if not more, reason for holding that Gamble had an interest in the agreement because he so asserted, as for holding that he had none because Hanchett so stated. If the declaration of Canda or Hanchett could curtail or control Gamble's rights, it should be remembered that, if there were any conflict between their declarations and that of Gamble, the determination of the lower court on such conflict should not be disturbed. (23 Cyc. 462, and Nevada cases.)

There is no testimony by Hanchett, Canda, or any one else, nor any evidence of any act or fact, which in law would deprive Gamble of the one-third interest which he admittedly retained as the original party in securing the option, and there is no evidence indicating that Chadbourne ever parted with the interest conveyed to him by Gamble. Surrendering the contract in the name of

Wright and the giving of a new one in the name of Hanchett, obtained by the collusion of Wright and Hanchett, without any authority from Gamble or Chadbourne, and before the expiration of the contract executed by the Silver Peak Mines to Wright, which was owned by Wright, Gamble, and Chadbourne, did not deprive Gamble and Chadbourne of their interest, but equity carried it into the contract obtained in the name of Hanchett.

A court of equity, in order to do justice, need not consider seriously the contention of appellant "that each of the various options set forth in evidence constituted a separate, complete, and independent contract between the parties named therein and none others," nor the further contention that "no oral testimony could be admitted to contradict the written contract as to who were the parties to it and entitled to its benefits and privileges." The real rights of the parties could be extended equally well by an agreement stating that the time for performing the conditions in an existing or previously executed agreement were extended for a certain period or by executing a new contract in similar terms to run for that period. In the negotiations "extensions" were asked for before the old contracts expired, and new contracts were obtained as "extensions" and treated as such. Whether considered an extension or a new and independent contract, the time allowed for acquiring the property would be extended and the benefits resulting would be substantially the same. If after the lapse of one of the agreements a new one in similar terms with different dates had been given to a different party, who was not standing in a fiduciary relation or acting with one of the coowners to defraud, it would belong to him exclusively; but when a new contract is obtained by one standing in a fiduciary relation, or for the purpose of defrauding real owners, it is immaterial whether it be considered a separate and independent contract or an extension, for it inures to the benefit of the equitable owners of the agreement anyway.

Appellants' contention that the option was for the entire property is correct.   The contracts were, and were intended to be, assignable.   Gamble from the'beginning, and the parties who acquired an interest later, were at liberty to sell at will a part or all of their interests; but no party having less than the whole could compel the Silver Peak Mines to convey to him his proportion on the payment of his share of the expense, because the Silver Peak Mines had agreed to convey the whole property, and not any fractional part thereof, and could not be compelled to convey a part only when they had not agreed to convey less than the whole.   This is consistent with the principle of law which allows one of the coowners to recover the whole.   As contended, the court cannot make a new agreement with conditions different from the one made by the parties.

As the agreement for the option carried the right to enter into possession, prospect the mines, and work the ore, it was to a certain extent in the nature of a lease or term ownership of real property, and the coowners in the contract were in effect tenants in common.   Under the rule long recognized in this state, any one of them could bring an action in his own name for the benefit of himself and his coowners to recover the whole property. (*Sharon* v. *Davidson,* 4 Nev. 416; *Brown* v. *Warren,* 16 Nev. 288; *Nesbitt* v. *Delamar's Gold Mining Co.*, 24 Nev. 273, 77 Am. St. Rep. 807; *Union M. & M. Co.* v. *Dangberg,* 81 Fed. 87; note, 7 Ann. Cas. 999.)   The law in allowing one tenant in common to bring an action to recover for the benefit of all does not deprive any one of his rights without his day in court.   In an action by all or any of them against the Silver Peak Mines, the latter is not concerned regarding the particular part or the amount of the fractional interest held by Gamble, the original plaintiff, or the other parties to the option or contract. As soon as it appeared that any one of them had an interest in the contract, however small, he became entitled to demand and have possession and to exercise the option upon payment of the full amount and compliance with

the terms of the agreement. Payment or performance of the conditions of the contract by any one of the parties ought to be satisfactory to the Silver Peak Mines, which should not complain if there was not compliance by Hanchett when it was refusing to allow compliance by Gamble. The particular portion the other parties might be entitled to in case of dispute would be determinable in an action to which they were parties, or would at least require interpleading by them.

Partnership property may stand or be acquired in the name of any partner. (*Whitmore* v. *Shiverick*, 3 Nev. 288; *Hogle* v. *Lowe*, 12 Nev. 286; *Shanks* v. *Klein*, 104 U. S. 18, 26 L. Ed. 635; *Riddle* v. *Whitehill*, 135 U. S. 621, 10 Sup. Ct. 924, 34 L. Ed. 282; *Schlichter Jute Cordage Co.* v. *Mulqueen*, 142 Fed. 587.) Although the transactions by Gamble and his associates may not have constituted a partnership, they were in the nature of a joint adventure, or indicated ownership in common which should be controlled by the rules relating to partnership. (*Botsford* v. *Van Riper*, 33 Nev. 196, and cases cited; 23 Cyc. 453.) Gamble and Chadbourne continued to own their proportionate interest in the contract and extension in the name of Hanchett. Whether Wright continued to own a one-third interest for which he agreed with Gamble and Chadbourne, or whether he would own twenty per cent under his agreement with Hanchett, or whether he could recover anything after entering into such a transaction with Hanchett, does not affect the right of recovery against the Silver Peak Mines. After the agreement was changed to the name of Hanchett with the intention of depriving Gamble and Chadbourne of their interest, Hanchett held as trustee for them. If this were not so, the law would aid him in defrauding them.

Questions regarding division or accounting between Gamble and his coowners are not property in this case as against the defendants-appellants, for they have no legal interest therein. (*Nesbitt* v. *Delamar's M. Co.*, 24 Nev. 285, 77 Am. St. Rep. 807.) Gamble ought not to be deprived of his rights by the defendants' refusal to let him in under the agreement, when they were informed.

through the knowledge of Canda, who represented John I. Blair and the Silver Peak Mines, of all the circumstances, which showed that Gamble had an interest in the agreement notwithstanding it had been changed to the name of Hanchett. Being denied the right to enter into the possession and explore the mines under the agreement to which he was a partner or part owner, and having brought suit in due time, Gamble ought not to be deprived of his rights by any action or delays of his joint owners, or by long litigation with the defendants.

As Gamble was seeking to obtain possession and the right to prospect the mines and to proceed under the option, and brought suit to obtain his rights before the option expired, and has been long delayed in that suit by the conduct of the defendants in taking the case to the federal courts, and in other ways, the fact that the Silver Peak Gold Mining Company, long after the commencement of this action, took possession of and began working the mines, is no reason why the plaintiffs should be deprived of their previously acquired rights. With the *lis pendens* on file, which under the statute operated as a notice and warning to all persons, and the notoriety given to the case through the public press, the company before attempting to purchase the property may have taken measures to protect itself from loss in any event. If not, it has no right in law or equity against the plaintiffs. Canda wrote to Wright in July, 1894, in regard to possible litigation over the mines, saying: "We will, of course, defend them until you are satisfied to pay for them." It may be assumed that the Silver Peak Gold Mining Company, in purchasing the property for $500,000 and giving a mortgage to secure $400,000 of the purchase price, has been able to reimburse itself and be part paid by working the ores if the mines are of great value, and that the Silver Peak Mines guaranteed the title to the Silver Peak Gold Mining Company, as Canda had offered to have done in his letter to Wright.

Gamble acted in due time and brought this action in the proper state district court before the expiration of the period for the prospecting, developing, and purchasing of

the mines under the final agreement and extension in the name of Hanchett, and in which equitably Gamble, Chadbourne, and Wright were owners. No sufficient reason appears for holding that the plaintiffs should lose their rights by reason of the long delay since the filing of the complaint in this action on March 2, 1896. After the institution of the suit the mines were long idle, except as worked by Hanchett without expense to the Silver Peak Mines; one of the attorneys for the Silver Peak Mines became the district judge, so that the case could not be tried before him, and the plaintiffs obtained a writ of *mandamus* from this court to compel him to transfer the action to another judicial district. (*B. A. Gamble and F. S. Chadbourne* v. *First Judicial District Court*, 27 Nev. 233.) There were demurrers, amendments, amended and supplemental complaints filed. The Silver Peak Mines had the case transferred to and held in the federal court, making it impossible for Gamble to proceed in the state court, until it finally became apparent by the decision of the Supreme Court of the United States in the Wisner case, 203 U. S. 449, 27 Sup. Ct. 150, 51 L. Ed. 264, that the action had been erroneously transferred to or held in the federal court, because it was without jurisdiction in a case started in a court of this state between citizens of different states when none of them were residents of this state so as to be favored by local prejudice, and the case was remanded to the state court.

The delay while the case was in the federal court was caused by the defendant the Silver Peak Mines, and if there was any blame on the part of the plaintiffs for the delay prior to that time it was waived by the defendant when it moved to have the case transferred to the federal court and went to trial without moving to have it dismissed for lack of prosecution. It is not shown whether any undue delay before the removal of the case to the federal court or since it was remanded to the state court has been occasioned by the plaintiffs or the defendants, or the court, or circumstances which the parties could

not avoid, or whether it has been for the convenience and by the acquiescence of all the parties, or whether it has been to the detriment of any one of them, or that the plaintiffs unduly delayed the progress of the case in any way which should cause a forfeiture of their rights. As the defendants could have proceeded at will, and are not shown to have been hindered by the plaintiffs from proceeding, the defendants ought not to complain of. long delays which they did not try to avoid and in which they acquiesced, and a large part of which they directly and unnecessarily caused. After the trial in the district court, the Silver Peak Mines went again to the federal court to obtain a temporary order to restrain and delay proceedings, and besides moving for a new trial and appealing came to this court for a writ of prohibition. These proceedings were in addition to the three suits against Hanchett and the two of Blair against the Silver Peak Mines.

It does not appear that the plaintiffs are to blame for the period of five years intervening since the trial in the district court, nor that the defendants have been hindered at any time from pressing the case to a final determination as rapidly as they desired and action could be secured by the court. The decision was not rendered by the district court until February, 1909. Since that time there has been a motion for a new trial and appeal argued and determined, a petition for rehearing denied after reply thereto, with delays in preparing the thousands of typewritten and printed pages in the statements on motion for a new trial and on appeal and in the briefs and transcript.

In the statement on motion for a new trial there was a specification that "the evidence shows that whatever rights the parties claimed had been forfeited by their own negligence, laches, and delay long prior to the commencement of the action." Apparently this was made on the theory that all rights of Gamble and Chadbourne had lapsed when they failed to exercise their option under the original contracts to Gamble, and that Gamble and

Chadbourne had no interest in the agreement in the name of Hanchett. If any delay in pressing the action to trial could possibly be sufficient to cause a forfeiture of the substantial rights of the plaintiffs, by moving the case to the federal court, by going to trial in the state court, incurring the expense resulting therefrom, taking the chances on a favorable decision, and by appealing, without making any objection to delay by the respondents, and without showing that any unnecessary delay was caused by the respondents in which the appellants did not acquiesce, and by failing to show that the appellants were in any way injured by the delay, and by failing to take any exception or make any specification of error in regard to delay, objection was waived to any undue delay on the part of the plaintiffs in pressing the action to trial, if there was any such delay, which is not shown. As there is no specification of error in regard thereto, the question of undue delay is not in the case except as it is injected and considered in the majority opinion as one of the grounds for reversal of the judgment.

The decisions of the Supreme Court of the United States relating to laches, cited to sustain the opinion of the majority of the court, have no application to the facts in this case, which bears no resemblance to those actions, in that there were good reasons for dismissal which did not appear in this suit. In the case of *Johnston* v. *Standard Mining Co.*, 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480, after more than four years two actions were brought, one of which was dismissed for lack of jurisdiction and the other because of defective summons, and the case which was finally brought and held to be too long delayed was not started for over five years and was for the recovery of an interest in a mining claim.

In the case of *Willard* v. *Wood*, 164 U. S. 525, 17 Sup. Ct. 176, 41 L. Ed. 531, the process was issued and served nearly sixteen years after the making of the agreement and over eight years after the filing of the bill. The delay in both of these cases was beyond our statute of limitations, which is five years for real estate and two years for

mining claims.  How very different are the circumstances
in this case, where the action was brought promptly and
long before the expiration of the time for the fulfillment
of the agreement or the exercise of the option, and
where, as far as appears, the delay was caused by the
disqualification of the district judge and by the time
taken by the courts to prepare, hear, consider, and deter-
mine the motions, removals, and proceedings involved,
including the trial, motion for a new trial, appeal and
applications for writs.   If there had been any such delay
in bringing this action as in those cases, it would, if prop-
erly asserted, constitute good ground for denying relief
to the plaintiffs.   The Supreme Court of the United
States has not held, and it is safe to assume never will
hold, that a litigant loses his rights by laches when he is
denied the rights under his option and commences action
to recover before the option expires and the delay is
caused by the conduct of the opposite party or the court.
If Gamble had not brought suit until after the option had
expired, and it were shown by proper allegation and
proof that the defendants, without notice of his claims or
that he intended to bring suit, had been lulled into making
large expenditures and had opened up valuable bodies of
ore and greatly enhanced the value of the mines before
he commenced suit, instead of devoting their activities
for many years to resisting the plaintiffs, and he had
then sought to enforce the agreement, there would have
been good reason for holding that the suit was brought
too late.

The federal courts, under a different practice and in a
few isolated cases, may have arbitrarily dismissed actions
when the facts stated in the bill or complaint indicated
laches or unjustifiable delay on the part of the plaintiff;
but no case is found where relief is denied to the plaintiff
under circumstances in anywise similar to those existing
in this action.   It would be the better rule, and especially
under our code (Rev. Laws, 4943), which provides that
"there shall be in this state but one form of civil action for
the enforcement or protection of private rights, and the
redress or prevention of private wrongs," and that the

answer should contain denials and "a statement of any new matter constituting a defense or counterclaim," that in order to secure the benefit of the defense of laches, advantage of it must be taken by some appropriate pleading, or at least not without some showing that the plaintiff is guilty of laches, and not until after he has had an opportunity to refute such defense unless it is shown conclusively by the allegations of his bill.   The Supreme Court of Illinois has said that the reason for the rule requiring the defendant to set up the complainant's laches is to give him an opportunity to amend his bill by inserting allegations accounting for the delay. (*Williams* v. *Rhodes*, 81 Ill. 571; *School Trustees* v. *Wright*, 12 Ill. 432; *Hall* v. *Fullerton*, 69 Ill. 451.)

It has been held that laches is a defense which may be made by demurrer or answer; and some of the cases hold, following by analogy the rule in regard to the statute of limitations, when the facts alleged in the complaint do not show that the action is barred, that it should be made by answer.

In *Zebley* v. *F. L. & T. Co.*, 139 N. Y. 468, 34 N. E. 1069, the court said: "Under our system of procedure, even where the complaint upon its face discloses a cause of action barred by the statute of limitations, the question cannot be raised by demurrer, but by answer, and certainly a party ought not to be permitted to avail himself of the objection that the demand is stale, in consequence of facts not constituting a statutory bar, on easier terms than he could avail himself of the statute of limitations.   A court of equity undoubtedly may, under proper circumstances, in the exercise of discretion, decline to aid a party in the enforcement of a stale demand; but it is believed that such a result can seldom, if ever, be reached upon a demurrer to the bill, and without full examination of all the facts and circumstances of the case."

And in *Sage* v. *Culver*, 147 N. Y. 247, 41 N. E. 514, the court said: "It is also urged that since the complaint shows upon its face that the transactions stated were

had many years ago, the plaintiffs are chargeable with such laches, and their cause of action, if any, is so stale that equity will decline to interfere. The answer to this point is that, if the claim or cause of action is barred by lapse of time, that defense must be presented by answer, and the mere fact that it is old is not an objection that can ordinarily be presented by demurrer."

In *Darst* v. *Murphy*, 119 Ill. 352, 9 N. E. 891, the court said: "We do not understand that laches in the complainant in asserting his equities is relied upon as a defense. It is not set up in the answer, as it should have been if relied upon as a defense, and is only incidentally, as it seems to us, referred to in the brief of plaintiff in error, and we refrain from further discussion of that question."

Other cases hold that, if laches is not apparent from the plaintiff's allegations in the bill, the defense cannot be raised by demurrer, but must be set up by plea or answer. (*Snow* v. *Boston Blank Book Mfg. Co.*, 153 Mass. 456, 26 N. E. 1116; *Warren* v. *Providence Tool Co.*, 19 R. I. 360, 33 Atl. 876; *Scruggs* v. *Decatur Mineral Co.*, 86 Ala. 173, 5 South. 440.)

Under the prior decisions of this court and of other courts the defense of laches, if not asserted in the lower court, will be considered waived and cannot be urged in the appellate court. (*Humphreys* v. *Butler*, 51 Ark. 351, 11 S. W. 479; *Dawson* v. *Vickery*, 150 Ill. 398, 37 N. E. 910; *Walker* v. *Denison*, 86 Ill. 142.)

In *Collins* v. *Insurance Co.*, 91 Tenn. 432, 19 S. W. 525, it was held that the defense that a suit in equity had been abandoned by delay in its prosecution was waived by answering to the merits. This is in harmony with the opinions of this court rendered prior to the decision in this case.

In *Iowa Mining Co.* v. *Bonanza Mining Co.*, 16 Nev. 64, a number of the earlier opinions of this court relating to waiver were reviewed with approval, and in the course of a carefully prepared decision it was said: "The question first presented for our consideration, then, is this:

Conceding that appellant did not prosecute the action with reasonable diligence as required by section 2326, Rev. Stats. U. S., and that the action ought to have been dismissed, if respondent had taken the proper steps therefor before demurring and answering, was it error to enter a judgment of dismissal under the circumstances detailed above? By raising issues of law or fact, or both, did respondent waive his right to move for a dismissal of the action? Respondent claimed the mining ground described in the complaint adversely to appellant, and under the statute above referred to it was required, 'within thirty days after filing its adverse claim, to commence proceedings in a court of competent jurisdiction to determine the question of the right of possession, and prosecute the same with reasonable diligence to final judgment.' The same section also provided that 'a failure so to do shall be a waiver of his adverse claim.' * * * In other words, answering as respondent did was a complete waiver of previous delay, if the same act would have been so, had no leave to move for a dismissal been granted. * * * Demurring and answering were tantamount to saying to the court and appellant that it was ready and willing to try those issues, and that it did not desire to take advantage of the irregularity subsequently made the ground of a motion to dismiss. They were challenges to trial notwithstanding the delay. * * * The failure to prosecute this action with reasonable diligence consisted entirely in an unwarrantable delay in obtaining service upon the respondent; and, being such, it was, we think, only an irregularity in the time of proceeding.

"If the statute provided that a summons should be served within one month or one year after issuance, and that a failure to make such service should be deemed a waiver of the claim set up in the complaint, service thereafter would be irregular, but nothing more; and if seasonably sought, relief could be had; but should a defendant appear generally and answer the allegations of the complaint, without any reservation of his right to

move to dismiss, such action would undoubtedly be a waiver, and he would thereafter seek in vain to take advantage of the irregularity. Filing an answer under such circumstances would be taking a step in the cause, which from its nature would assume the propriety of trying instead of dismissing it, and would be a waiver of any objections to going to trial upon the issues raised. If, without service of summons, respondent had appeared and answered, denying all the material allegations of the complaint, and after so doing had moved to dismiss, there can be no doubt that the motion would have been too late. Its answer would have been a notice, voluntarily given, of a willingness to proceed with the trial. We are satisfied that the same result follows from demurring and answering as was done in this case. The following authorities sustain the conclusion arrived at upon this branch of the case: *Pearson* v. *Rawlings*, 1 East, 77, wherein Lord Kenyon said: 'It is the universal practice of the court that where there has been an irregularity, if the party overlook it and take subsequent steps in the cause, he cannot afterwards revert back to the irregularity and object to it.' See, also, *D'Argent* v. *Vivant*, Id. 330; *Mayor* v. *Lyons*, 24 How. Prac. 282; *Higley* v. *Lant*, 3 Mich. 612; *Buel* v. *Dewey*, 22 How. Prac. 344; *Warren* v. *Glynn*, 37 N. H. 343; *Dale* v. *Radcliffe*, 25 Barb. 334; *Barber* v. *Hubbard*, 3 Code Rep. 171; *Baker* v. *Curtis*, 7 How. Prac. 480; *Belt* v. *Blackburn*, 28 Md. 240; *Crull* v. *Keener*, 18 Ill. 66; *Pryce* v. *Security Ins. Co.*, 29 Wis. 274; *Upper Miss. Trans. Co.* v. *Whittaker*, 16 Wis. 222; 4 Waite's Prac. 629, *et seq.*"

In that case there was a delay of about three and a half years in making service of the summons. It was properly held that by filing an answer the right to object to the delay was waived, notwithstanding the provisions of the United States statute requiring the plaintiff to commence proceedings within thirty days and to prosecute the same with reasonable diligence to final judgment, and that "a failure to do so shall be a waiver of his adverse claim." There is no statute, state or

federal, with any such provision or penalty relating to the pending action. Penalties and forfeitures are not favored in law unless plainly prescribed, so that litigants or persons may be forewarned. Immeasurably stronger are the reasons for holding in this case, without any statute requiring diligence or prescribing a penalty for delay, that if there was any undue delay occasioned by the plaintiffs, which is not shown, it was waived by the defendants by demurring, answering, making motions, going to trial, appealing, and by making long and persistent defense on the merits without alleging or moving to dismiss because of undue delay on the part of the plaintiffs, than holding that filing an answer waived an objection as in that case, in which the delay in making service of summons was nearly twice the period of limitation which bars an action for the recovery of mines, and to its extent more than any unnecessary delay shown to have been caused by Gamble, the plaintiff in this case, although the principle is the same.

The disastrous effects resulting to the plaintiffs from the delay, trouble, and expense of litigation, by holding that there was no waiver, and that any rights of the plaintiffs were lost by delay, are far greater here than they would have been if the court had held that there was no waiver and that any rights of the plaintiff were lost in that case. It appears that there has been no undue delay on the part of the plaintiffs since the trial in the district court, and if there was any undue delay on the part of the plaintiffs before the trial, which is not shown, it was waived.

In the opinion in *Botsford* v. *Van Riper*, 32 Nev. 225, it is stated: "We think, also, that the point raised by counsel for appellant that the respondents, by entering into numerous stipulations heretofore referred to, which reserved no right to object or except to the sufficiency of the record, waived the right to move to dismiss, or to strike upon any grounds that were not jurisdictional. (*Henningsen* v. *Tonopah and Goldfield R. R. Co.*, 32 Nev. 51; *Smith* v. *Wells Co.*, 29 Nev. 416; *Bliss* v. *Grayson*, 24 Nev. 432; *State, ex rel. Curtis,* v. *McCullough*, 3 Nev. 213.)

Among the other cases in this state supporting the doctrine of waiver are *Killip* v. *Empire Mill Co.*, 2 Nev. 44; *White* v. *White,* 6 Nev. 25; *McWilliams* v. *Herschman,* 5 Nev. 265; *Lonkey* v. *Wells,* 16 Nev. 271; *Hammersmith* v. *Avery,* 18 Nev. 225; *Truckee Lodge* v. *Wood,* 14 Nev. 293.

The doctrine of waiver, as established by numerous decisions of this court, including the one in the Botsford case, and supported by the learned members of this court who have written the majority opinion in this case, is a just one, and for the reasons indicated I feel in duty bound to emphatically dissent from any conclusion which may affect this action or stand as a precedent for the future, that cases may be determined and the rights of parties may be lost or judgment summarily rendered against them because of dilatoriness or long delays in the courts, or without any allegations or evidence to show any undue delay by the parties long seeking to obtain their rights. If any person seeking to obtain his rights starts an action, and after delay for many years, or nearly a generation as in this case, resulting as far as shown from the fact that defendants are nonresidents, making service more difficult, from the disqualification of the district judge of the court in which the action is brought, from the removal of the case to the federal court by the defendants, remanding and trial in the state court, motion for a new trial and other motions, appeal, proceedings in other courts brought by able lawyers apparently for the purpose of preventing or delaying the final determination on the merits of the case in the state court, may have the case arbitrarily dismissed in this court without warning, pleading, or showing, on the ground that he is guilty of laches, notwithstanding all his efforts to obtain a judgment establishing his rights, no litigant need feel assured that he can obtain protection from the courts when he may be strenuously opposed and delayed by the arts known to the legal craft and counsel employed by a wealthy defendant.

When an action is brought within the time prescribed by the statute of limitations, and service of process is made on the defendant within the time required by the

act of the legislature, and the defendant has thereby been brought into court and is as free to press the litigation to a final determination as the plaintiff, under many well-reasoned decisions the defendant acquiesces in and cannot take advantage of the delay. There is no case to be found in the books since equity courts were established to award justice to men, in which the circumstances are similar, or which approaches this one, in which a complainant has been denied relief by reason of laches or delay. In justice to the district court, as well as to the plaintiffs, any objection to delay in that court should have been made there, where the circumstances could be better known and determined, and before waived by answering and going to trial. When not shown by the complaint, the defendant should at least be required to allege in some appropriate way, and prove, that there was undue delay for which the plaintiff was blamable, and the latter should have an opportunity to meet and disprove the claim before equitable relief is denied by any court on that ground.

Although it is now conceded that the federal court properly remanded this action to the state court and that the federal court has no jurisdiction over Gamble and the plaintiffs in this case, to which they are parties, it is claimed that his rights, if any, under the option and questions regarding them, have been determined conclusively against him in later suits brought by the Silver Peak Mines against Hanchett in the federal court, to which the plaintiffs were not parties. In support of this contention the United States circuit judge has temporarily enjoined the state district court of Washoe County from proceeding with this case. But with the admission an order made by the federal court in obedience to the decision of the highest tribunal in the Wisner case, how can it be claimed that the rights of the plaintiffs here were finally adjudicated against them in an action in the federal court in which they were not parties, and in which no issue relating to their claims or their right to a decree allowing them to comply with the conditions of

the agreement and to exercise the option it carried was presented or considered?

Notwithstanding the high regard we have for the opinions of the federal courts, and especially for the decisions of that eminent jurist who wrote the recent opinion for the Circuit Court of the United States in the proceeding brought there to enjoin the district court in the enforcement of the judgment in this case, this court should not feel constrained to follow any decision which is obviously erroneous and in conflict with the opinions of other federal courts, including the Supreme Court of the United States, when it would result in the denial of justice to litigants in this court pertaining to matters over which the jurisdiction is exclusively in the courts of this state and not in the federal court. However, the opinion on the temporary injunction should be regarded as only temporary, and, as usual in granting a temporary injunction, made without full hearing and knowledge of all the facts or deliberative consideration, and intended to hold proceedings in abeyance until such time as a final hearing and fuller investigation and proper determination may be had. It need not be assumed that the distinguished judge of the intermediate federal court who granted the temporary injunction against the district court, which is under the supervision and deserving of the protection of this court, will finally order that the temporary injunction be made permanent, nor that the Supreme Court of the United States would fail to restrain the enforcement of such an injunction on the ground that the federal courts are without jurisdiction because the jurisdiction over the parties is in the state courts, as heretofore held by the federal court.

There are important questions in the case which may not have been presented to or considered by the learned judge who reached these conclusions. If the federal court in a state in which neither of the parties were inhabitants had any jurisdiction in the case against Hanchett, and if he were the only necessary defendant party to determine the rights under the contract, and

the plaintiffs in this action were claiming anything under Hanchett, the conclusion reached would undoubtedly be correct. If the judgment is good against Hanchett, it is good against every one claiming under him. But no one is claiming under Hanchett. The plaintiffs are seeking a decree for their previously initiated rights under an agreement which was fraudulently shifted to the name of Hanchett. Under the decisions of the federal and state courts, Gamble and Chadbourne were part owners of the option or agreement in the name of Hanchett. The Silver Peak Mines had notice of the facts which in law made Gamble and Chadbourne such owners in the contract. Their rights in the contract were as complete as if they had been named as parties to it. They were as necessary parties in an action by the Silver Peak Mines to terminate the contract as if they had been named as parties to the contract, or as if Hanchett had assigned them an interest in the contract before the institution of the suit and they had given notice of the assignment. As the others were owners in the contract and were necessary parties in any suit to foreclose it, even Hanchett's interest was not terminated by the judgment against him if the federal court had jurisdiction. To finally hold that Gamble and Chadbourne are bound by the judgment against Hanchett would deprive them of their rights in derogation of the constitutional guaranties known to every lawyer, under which no person is to be deprived of property without due process of law or an opportunity to have his day in court. As the Silver Peak Mines had knowledge of the facts and notice of the claims of Gamble, Chadbourne, and Wright, if it desired to have them bound by the judgment in the action it brought against Hanchett alone, it should have made them parties to that suit and given them an opportunity to defend or to assert that the jurisdiction was in this action, which was the first to be instituted.

If under the act of Congress of March 3, 1887 (sec. 1, c. 373, 24 Stat. 552, U. S. Comp. St. 1901, p. 508), providing that actions between citizens of different states should not be brought in any other district than that

whereof one of them was an inhabitant, and under the decision in the Wisner case, 203 U. S. 449, 27 Sup. Ct. 150, 51 L. Ed. 264, the federal courts of New York and Nevada had any jurisdiction in the action brought by the Silver Peak Mines, a corporation organized under the laws of New York, against Hanchett, a resident of California, the rights and claims of Gamble, Chadbourne, and Wright could not be curtailed or affected in a suit to which they were not made parties. More than a year prior to the institution of that action the complaint had been filed by Gamble in this suit against Hanchett, Wright, Chadbourne, George Crocker, and the Silver Peak Mines, and the *lis pendens* filed, giving notice to the world that Gamble asked to be decreed the owner and entitled to the possession of a one-third interest in the contract, and that he was entitled with the defendants holding the contract, upon the fulfillment of the terms of the agreement with the Silver Peak Mines, to a conveyance of the property mentioned in the agreement. This was in addition to the notice personally given by Gamble to the Silver Peak Mines that he, Chadbourne, and Wright were the owners of the agreement executed in the name of Hanchett.

The assumption that the rights of Gamble and others were cut off under the judgment against Hanchett is erroneous, not only because Gamble and the others known to have an interest in the option were not made parties to the suit and had no opportunity to defend, but because no issue as to whether Gamble, Chadbourne, and Wright had an interest in the option was presented or determined in the federal court, and because the federal court in this state had no jurisdiction in an action against him by a resident of New York or New Jersey when he was a resident of California and was not made a party and did not appear. If instead of having a right antagonistic to Hanchett, Gamble and Chadbourne held in privity to Hanchett, or had been made parties to the suit brought by the Silver Peak Mines against him, the judgment in that case would not affect the rights they assert here; not only because their claims were not in issue in

the pleadings in that action, but because the jurisdiction would be in this case, for the reason that it was the first one commenced.

If the federal court ever had or has any jurisdiction over these plaintiffs, necessarily it is in this action and not in the one brought by the Silver Peak Mines against Hanchett, because this case was the first one brought, because it is the only one in which the plaintiffs were parties, because it is the only one in which the issues involved here were presented or determined, and because this case was removed to the federal court in due time if that court has jurisdiction. As against these salient reasons, none appear for holding that the rights of these plaintiffs were lost clandestinely in an action to which they were not made parties and in which their claims were not presented or considered.

It is elementary that parties in interest must be made parties before their rights can be adjudicated in an action by a party having knowledge of their interest and notice of their claims. The judgment is not binding on persons who were not made parties to the action, and not even on parties to the action if others who were not included were necessary parties. (*Keller* v. *Blasdel*, 1 Nev. 491; *Hollingsworth* v. *Barbour*, 4 Pet. 466, 7 L. Ed. 922; *St. Clair* v. *Cox*, 106 U. S. 353, 1 Sup. Ct. 354, 27 L. Ed. 222; *Cockburn* v. *Thompson*, 16 Ves. 321, 326; *Adair* v. *New River Co.*, 11 Ves. 429; *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 349; *Wiser* v. *Blachly*, 1 Johns. Ch. 437; *Brasher* v. *Van Cortlandt*, 2 Johns. Ch. 245, 247; *West* v. *Randall*, 2 Mason, 190, Fed. Cas. No. 17,424; *Hallett* v. *Hallett*, 2 Paige, 15; *Joy* v. *Wirtz*, 1 Wash. C. C. 517, Fed. Cas. No. 7,554; *Elmendorf* v. *Taylor*, 10 Wheat. 152, 6 L. Ed. 289; *Crocker* v. *Higgins*, 7 Conn. 342; *Robinson* v. *Howe*, 35 Fla. 81, 17 South. 370; *Con. Water Co.* v. *San Diego*, 93 Fed. 851, 35 C. C. A. 631, and cases cited.)

In his work on Judgments (vol. 1, sec. 220), Mr. Black says: "A personal judgment rendered against a defendant without notice to him, or an appearance by him, is without jurisdiction and is utterly and entirely void."

In *Gregory* v. *Stetson,* 133 U. S. 579, 10 Sup. Ct. 422, 33 L. Ed. 792, the complainant sought to obtain a decree declaring a note to be held in trust and adjudging him to be the owner thereof. The Supreme Court of the United States held that in equity all persons materially interested either legally or beneficially in the subject-matter of the suit must be made parties, and that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it.

The doctrine of *res judicata* applies only to matters in issue. (*Deal* v. *Schlomberg,* 20 Nev. 330; *House* v. *Lockwood,* 137 N. Y. 259, 33 N. E. 595; *Neilson* v. *Pennsylvania Coal and Oil Co.,* 78 Minn. 113, 80 N. W. 859.)

In *Union M. & M. Co.* v. *Dangberg,* 81 Fed. 74, it was held that: "Former decrees which are final and unreversed are *res judicata* of the subject-matter of the suits as then decided between the parties thereto and their successors in interest.  *  *  *  They are not conclusive as to matters which might have been decided therein, but only as to such matters as were in fact decided within the issues raised by the pleadings."

In *Smith* v. *Town of Ontario,* 4 Fed. 386, it was held that: "The former adjudication is an estoppel only as to the matters in issue or points in controversy, upon the determination of which the finding or verdict was rendered. The matter in issue or point in controversy is that ultimate fact or state of facts in dispute upon which the verdict or finding is predicated."

At section 614, volume 2, of Black on Judgments, it is said: "We have now seen that the estoppel of a judgment does not extend to such matters as come only incidentally or collaterally into the controversy, but only to points actually and necessarily adjudicated. In other words, that a former judgment is conclusive only as to the matters in issue or points in controversy, upon the determination of which the finding or verdict was rendered."

The judgments against Hanchett in actions in the federal courts regarding matters in dispute between him

and the Silver Peak Mines, pertaining to whether he had complied with the agreement, or had failed to account for royalties, or had injured the property, cannot properly be held to be a determination of the issues involved in this case between different parties and concerning different matters.   The controlling questions here as to whether Gamble, Chadbourne, and Wright were parties to the joint venture, and as such entitled to an interest in the agreement and extension fraudulently obtained by Wright and Hanchett in the name of Hanchett for the purpose of eliminating Gamble and avoiding an agreement to carry his interest without expense, and with the knowledge and assistance of the Silver Peak Mines, and whether the Silver Peak Mines has wrongfully deprived Gamble of the opportunity of exercising his rights under the agreement and option, were not presented, considered, or determined in the actions brought in the federal courts, and consequently any judgment determining these issues in the state court is not in conflict with the judgments in the federal courts.   If the same issues had been presented, tried, and determined in the case of the Silver Peak Mines against Hanchett which are involved in this action, their determination in that case would not have been binding upon the plaintiffs here, because there was no privity between the plaintiffs here and Hanchett, who was acting in hostility to them and was endeavoring to deprive and defraud them of their rights, and because the plaintiffs here would have been necessary parties in determining these issues, which are hostile to the claims of Hanchett.

It would be dangerous indeed to hold that in every or any case where an unfaithful partner, agent, or trustee takes a deed in his own name, or in the name of some one acting fraudulently with him, for property or rights paid for with the funds or belonging to his principal or others, the agent, partner or trustee, or party acting with one of the partners to defraud the others, could by collusive or other suit against parties having notice of the claims of the real owner, but in which he is not a party and has no

opportunity to present his claims or litigate his rights, secure a judgment which would be binding on the owner. Although Hanchett acted as agent for Chadbourne and Wright in securing the agreement or extension in the name of Wright which was for the benefit of Gamble, Chadbourne, and Wright, he did not act as agent when, in collusion with his son-in-law, Wright, he secured the agreement or extension in his own name for the purpose of depriving and defrauding Chadbourne and Gamble of their interest.

If plaintiffs here claimed anything by assignment or privity from Hanchett after a judgment against him in a court of competent jurisdiction, rendered when the necessary parties were before the court, they could be prevented from enforcing such claim. What plaintiffs demand is not from Hanchett, but an interest in an option or venture which belonged to them before Hanchett was connected in any way with the enterprise. Although they were interested in the contract, they were not parties nor in privity under any judgment obtained against Hanchett in a suit on the contract. They were not grantees of Hanchett. Their rights did not come from him, and consequently they could not be bound by any judgment against him in an action to which they were not made parties. As there is no question regarding a silent partner or party to the venture, or undisclosed agent, and as Canda and the Silver Peak Mines had knowledge of the facts and participated in the transactions which in law gave the interests to Gamble, Chadbourne, and Wright, and were informed of Gamble's claims by letters and by the *lis pendens* filed by him in this action long before the commencement of the suit by the Silver Peak Mines against Hanchett, Gamble and Chadbourne were as necessary parties to the suit of the Silver Peak Mines against Hanchett as if they had been directly named as parties in the contract given in the name of Hanchett, or as if they had held assignments each of a one-third interest from Hanchett in that

contract and had given notice to the Silver Peak Mines of such assignment.

If the opinion granting the temporary injunction were made final, inconsistency would result from the fact that after this action in which Gamble is plaintiff was taken into the federal court Judge Hawley refused to remand to the state court, but after the decision in the United States Supreme Court in the Wisner case and by the United States Circuit Court of Appeals in the Cucciarre case, 163 Fed. 38, 90 C. C. A, 220, Judge Farrington remanded this case to the state court because the federal court had no jurisdiction in an action in which Gamble was a party against the Silver Peak Mines. The result would follow that, after the federal court had held that it had no jurisdiction over Gamble in an action in which he was a party, another federal court would hold that it had jurisdiction over him because of an action against Hanchett in which Gamble was not a party. In other words, the federal court would hold jurisdiction over Gamble and Chadbourne in an action in which they are not parties, but cannot have jurisdiction over them in a previously instituted action in which they are parties, when if there is any jurisdiction in the federal court over Gamble and Chadbourne it would be in this action to which they are parties.

A further reason why a special writ should not be issued to restrain the state court is that, after it had been determined by the federal court in remanding the case that the state court had jurisdiction to proceed, there was no appeal from that order, and it ought to be treated as final, unless void because the jurisdiction is still in the federal court. (*Mo. P. R. Co.* v. *Fitzgerald*, 160 U. S. 580, 16 Sup. Ct. 389, 40 L. Ed. 542.) We have the decision standing as final of one federal court that it has no jurisdiction over the controversy and parties in an action in which they are named and appear, and later of another federal court that the federal court which finally held that it is without jurisdiction did have jurisdiction and conclusively adjudicated the controversy and cut off the rights of the plaintiffs in an action in which they

were not named, did not appear, and had no opportunity to assert their rights or defend.

If the act of Congress limits the jurisdiction of the federal court to the district in which one of the parties is an inhabitant, it may be questioned whether the foreclosure suit by Blair, a resident of New Jersey, against the Silver Peak Mines, a corporation, resident of New York, and Hanchett, a resident of California, ought not to have been brought in the state court instead of in the federal court. If under later decisions jurisdiction may be conferred by consent, this could be so only as to parties to the action. Gamble and the plaintiffs, not having been made parties to the foreclosure or other suits, all started after this action and the filing of *lis pendens*, are not in any way bound by the judgments in them. Although the mortgage to Blair was prior to the options given to Gamble, Wright, and Hanchett, their right to take the property over under the option could not be terminated without making them parties to the foreclosure suit and giving them an opportunity to pay off or to redeem from the mortgage, or to plead their option gave them the right to purchase the property clear of the mortgage.

If the agreement had provided only for an option, and payment or tender had not been made within the time allowed by its terms or by extension, any right to purchase the property by Gamble, Chadbourne, or parties to the agreement, would have expired on the date specified. It is because the contract provided for taking possession, prospecting the mines, and working the ore so that the value of the property might be better determined before exercising the option that equity ought to enforce a compliance with these provisions and give the opportunity for prospecting and examination of the mines as provided in the contract before denying the right to exercise the option.

As Gamble, Chadbourne, and Wright agreed to enter into a joint venture regarding the exploration and purchase of the Silver Peak Mines, considered equitably it ought to make no difference whether the property, option,

agreement, or purpose sought was acquired through a natural person or corporation or by assignment and delivery of all the stock of a corporation owning the property. As the first agreement was with Blair, the owner of the corporation that owned the property, later agreements secured in the name of any party to the venture, or of any agent, should be regarded as for the benefit of all the parties to the contract. As the options were assignable and not personal, no good reason appears why the Silver Peak Mines, if willing to fulfill the agreements on its part, should object to having the conditions of the contract performed by Gamble or any of the other parties having an interest in it, or why their money or fulfillment of the agreement should not be as acceptable to the Silver Peak Mines as by any one else, except that it may have been believed that by joining with Wright and Hanchett they would be more likely to obtain and pay the desired money if Gamble were thrown out and they could avoid accounting to him for his share of any profits in the promotion or venture which had been brought about by him.

Notwithstanding notice and a knowledge of the facts which made the parties to the venture part owners in law and gave the right to any one of them as such to take over the whole property upon compliance with the contract, the Silver Peak Mines, since it adopted the course of ignoring Gamble after he had been used to interest parties who were believed to command more means for improving and making payment on the property, has persistently, in court and out, for seventeen years, sought to prevent Gamble from securing any benefit under the contract. His right to enter and prospect the property and determine whether he would exercise the option, which if not denied and opposed by the Silver Peak Mines would have extended only to the date provided in the agreement for purchasing the property under the option, has been delayed during all these years by the action of the company in refusing to recognize his interest in the agreement, and equity should now give him the

time and opportunity to which he is entitled under the agreement and which he has been prevented from exercising by the continued resistance of the Silver Peak Mines.    No blame can attach to Gamble or the plaintiffs because Hanchett failed to comply with the conditions of the option, make payment, and take over the property while the Silver Peak Mines would not recognize Gamble's or plaintiffs' rights or allow them the privileges awarded by the contract or the opportunity to fulfill its conditions. The claim that Gamble is not entitled to a decree because the time for him to act under the agreement and exercise the option has expired should not avail the defendants, for it would allow them to take advantage of their own wrong in preventing Gamble from exercising his rights under the agreement.

Notwithstanding that the performance of the contract fraudulently obtained in the name of Hanchett was not limited to him, as he was merely holding the legal title to it as trustee, and any of the owners in that contract were entitled to comply with its terms or have its requirements fulfilled so as to protect their interests, the Silver Peak Mines, while at first allowing Hanchett the privileges conferred by the agreement, and later while suing him for lack of fulfillment of the agreement, were refusing to recognize Gamble or give him or parties he might induce to join him an opportunity to comply with the contract or to prospect, work, or purchase the property.    If the Silver Peak Mines had not repudiated Gamble, he would have been required to perform the conditions of the agreement and pay for the property within the time allowed by its terms or lose all rights under the agreement.    By repudiating Gamble and Chadbourne and resisting and delaying this suit since it was brought by Gamble, defendants have prevented him from having the opportunity to exercise the rights under the agreement.    Defendants ought not to complain that he did not exercise his rights within the time stated in the agreement when they have made it impossible for him so to exercise them, and they should not be allowed

to deprive him of his rights by their own conduct in preventing him from exercising them. They should not complain of the delay they have caused, and should be required to give the plaintiffs its equivalent in time for performing the conditions of the agreement, for otherwise they would be allowed to take advantage of their own breach of the contract and the delay they have caused. If a court of equity is to grant relief and require compliance with the terms of such a contract, necessarily it would be after breach by the defendants, and after the time fixed by its terms for compliance has expired, when the defendants have refused to allow compliance within that time.

As equity regards that as done which ought to be done, and will require that to be done which ought to be done, and as heretofore Gamble and the plaintiffs have been prevented by the Silver Peak Mines from entering into possession or prospecting the property or from exercising the right to buy it under the agreement in the name of Hanchett, the time for the performance of the agreement should be considered as extended, and the plaintiffs should be allowed a reasonable time, at least as much as the period intervening between the commencement of this suit and the termination of the option, or as much as the time intervening between the refusal of Canda and the Silver Peak Mines to longer acknowledge the rights of Gamble and the final date allowed by the extension, in which he or the plaintiffs may exercise the privileges which were to be allowed under terms of the agreement.

Although Gamble did not bring this suit for over a year after Hanchett secured the contract in his own name, he brought it a long time before the statute of limitations had cut off his right to sue and before the extension secured in the name of Hanchett had expired, and before suit promptly endeavored to obtain recognition of his rights when he became aware that Wright and Hanchett were endeavoring to defraud him of his interest by shifting the contract and option to the name of Hanchett after Wright and Chadbourne had agreed to carry Gamble's

one-third proportion without expense. In the meantime Hanchett was making large expenditures in prospecting and working the property and an effort to comply with the agreement, evidently expecting to reap all the benefits therefrom for himself and his son-in-law, Wright, and any delay of Gamble in bringing suit could not have prejudiced the defendants, because they were not spending money upon or attempting to work the property during any part of that period, and it was in the possession of Hanchett, claiming under the agreement in his name.

If it be admitted that Gamble, Chadbourne, and Wright were trying to promote a mining enterprise by the money of others, and that they spent only a limited amount of time and money in examining the property, having it experted, and going to and negotiating with men of means and influence, there is nothing illegal or wrong in such transactions; and as long as they complied with the terms of the contracts in which they were interested, and which had been obtained through them, in law, equity, and justice they should be as fully protected in their rights under the terms of the contracts as if they had expended or possessed millions of money. The defendants and the court cannot properly deny in advance their rights under the agreement because it may be believed that eventually they will not have or be able to obtain the means with which to purchase the property. The law is no respecter of persons, and should deny no right to the poor which it confers upon the wealthy suitor.

Our government, and every other modern, progressive government which has passed its barbaric or despotic state, is based on the principle that its citizens are equal before the law. The fourteenth amendment to the federal constitution provides that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 1 of article 1 of the state constitution declares

that: "All men are, by nature, free and equal and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and pursuing and obtaining safety and happiness." And section 8 of article 1 that "no person shall be deprived of life, liberty or property without due process of law."

Judge Hawley, speaking for this court in *State* v. *Overton*, 16 Nev. 152, properly expounded the law when he said: "Courts cannot make any distinction in this respect, as to the nature of the transaction or the character of the persons engaged in it. It is their bounden duty to declare the law. 'The law knows no person; it is not made for the individual man, but for men. As the dew of heaven falls, so it bears alike upon the just and unjust.' (*State* v. *Pierce*, 8 Nev. 304.) It smiles and frowns upon all alike. It makes no distinctions."

I especially dissent from the reasons and conclusions assigned for the majority opinion, which are based on matters which are not in the record, or which are contrary to the undisputed facts or the decisions of this court and well-settled principles of law.

Such as that it is not shown that the Silver Peak Mines had notice that Gamble was an owner in the option, when the written evidence is direct and undisputed in the transcript that the Silver Peak Mines, in addition to having knowledge of the facts, actually had such notice long before the commencement of any of the suits and before the execution of the contracts and extensions in the names of Wright and Hanchett, and had not only actual but constructive, and by statute conclusive, notice by the filing of the *lis pendens* in this case long before the suits against Hanchett were started by the Silver Peak Mines; and when this suit, the first one commenced, was notice, and a failure to give notice before suit would affect only costs.

Such as that "there is nothing in the evidence warranting any conclusion of fraud or bad faith upon the part of the Silver Peak Mines toward Gamble or his associates,"

and such as that it cannot be said to be established with any degree of certainty that Canda was informed of the alleged partnership relations entered into by Gamble, Chadbourne, and Wright as such partnership is sought to be established in this suit, when the evidence shows clearly, conclusively, and without dispute that Canda, as agent and secretary of the Silver Peak Mines, was fully aware of conditions which in law made them partners or parties to a joint venture, and that he and the Silver Peak Mines by shifting the agreement to the name of Hanchett and by resisting the claims of Gamble have long endeavored, and the Silver Peak Mines are still endeavoring, to deprive and defraud him of his rights.

Such as that there is no proof of fraud committed by the Silver Peak Mines, while under the undisputed facts, of which the Silver Peak Mines had knowledge, and under the decisions of this court applicable to those facts, it would be the sanctioning of fraud by the court if the Silver Peak Mines is allowed to succeed in the effort which it has made for so many years to prevent Gamble from exercising his rights under the agreement executed in the name of Hanchett.

Such as that Gamble and Chadbourne had no interest in the agreement or extension in the name of Hanchett because Hanchett and Canda may have so stated, when their statements were hearsay and self-serving and not properly in the case, and could not overcome or affect the undisputed facts, which under the decisions of this court show that Gamble and Chadbourne and Wright did have an interest, and when Hanchett and Canda should not be allowed to make the finding and conclusion for this court in support of their own fraudulent acts, contrary to the undisputed evidence in the case, the finding of the district court, and these decisions.

Such as that Gamble, Chadbourne, and Wright were trying to promote a mining enterprise upon the money of others, when it was entirely legitimate for them to do so and the Silver Peak Mines was informed from

the beginning of the transactions that such was their intention.

Such as "that Gamble, Chadbourne, and Wright either did not have the money themselves to put into the venture, or did not propose to risk any considerable amount thereof to carry out the options," when, regardless of whether they had much or little money, they were entitled to have the agreement complied with and to be allowed to enter into possession, prospect and examine the property, and determine its value before buying it or before the denial of their right to induce others to buy it.

Such as that "the Silver Peak Gold Mining Company, the present owner of the property, is shown to have purchased it upon the faith of certain judgments rendered by the Circuit Court and the Circuit Court of Appeals," when the suits in which these judgments were rendered could not in any way properly affect the rights of Gamble, Chadbourne, or Wright, because they were not parties to those judgments, and previous to the commencement of the suits in which they were rendered this action had been commenced and *lis pendens* filed, which gave notice to the world and under the statute warned the Silver Peak Gold Mining Company and its successors that they could not purchase the property except subject to the rights of the plaintiffs.

Or such as that Gamble lost his rights by delay, when there is no issue or evidence in the lower court, nor in this court, showing any undue delay on the part of Gamble in bringing or pressing the suit, and no exception or assignment of error in that regard, and no showing that the delay was not caused or acquiesced in by the defendants, or that it was not incidental to the courts and the strong defense and resistance made by the defendants and beyond the control of Gamble, or that the defendants were damaged by any delay which they had not caused or in which they had not acquiesced, and when it appears that if there was any undue delay objection to it was waived by the defendants going to trial without objection, and when it is apparent that the plaintiffs are not

responsible for the long delays in the district court since the trial and on the appeal, and that this action would not have been brought if the Silver Peak Mines had allowed Gamble the opportunity of exercising his rights under the agreement and option within the time provided by the final extension.

As said through Massey, C. J., in the opinion in *Schwartz* v. *Stock*, 26 Nev. 143: "This court will not indulge in presumptions against the regularity of the proceedings of the trial court. It has repeatedly held that all presumptions favor the regularity of the proceedings of that court, and that where error is alleged it must be affirmatively shown by the record before this court will reverse an order or judgment of the lower court. (*Champion* v. *Sessions*, 2 Nev. 271; *Nosler* v. *Haynes*, 2 Nev. 53; *Lady Bryan Gold and Silver M. Co.* v. *Lady Bryan M. Co.*, 4 Nev. 414; *Mitchell* v. *Bromberger*, 2 Nev. 345, 90 Am. Dec. 550; *Allison* v. *Hagan*, 12 Nev. 38; *Nesbitt* v. *Chisholm*, 16 Nev. 39; *Leete* v. *Sutherland*, 20 Nev. 71.)"

I concur in the order of this court reversing the judgment from which the appeal is taken; but believing that a rehearing ought to have been granted so that the views of all the different members of this court, as expressed in the opinions, and new questions suggested which ought to control in determining the controversy, might be considered and argued by opposing counsel, I dissent from the order denying the petition for rehearing. The learned district judge, now deceased, was right in his conclusion that the plaintiffs ought to recover; but the judgment being for the fractional interest claimed by the plaintiffs, instead of for the whole property, cannot be sustained upon an agreement which was entire and did not provide for an option on or the sale of any fractional interest.

As the allegations of the complaint and the undisputed evidence show that the plaintiffs are entitled to enforce the contract as to the whole property, and the parties are before the court, it would be proper under the usual

practice and the provision of the statute for the liberal allowance of amendments to permit the plaintiffs to amend the prayer of the complaint and ask for a decree declaring the agreement and extension in the name of Hanchett to be in trust for their benefit, awarding them the right to prospect and work the mines and exercise the option to purchase the whole property, and to have judgment accordingly if the proofs upon a new trial show the same state of facts as are now disclosed by the record; the plaintiffs to be allowed as much time for examining and prospecting the property and exercising the option to purchase as they would have had under the contract if the Silver Peak Mines had not denied them these privileges, to which they were entitled as part owners under the contract, or at least as much time as intervened between the filing of the complaint in this action and the expiration of the last extension of the agreement in the name of Hanchett.